UNITED STATES of America ex rel. William DAVIS, Petitioner-Appellee,

v.

Hon. Daniel McMANN, Warden of Clinton Prison, Dannemora, New York, Respondent-Appellant.

No. 159, Docket 30493.

United States Court of Appeals Second Circuit.

Argued Sept. 23, 1966.

Decided Oct. 26, 1967.

Certiorari Denied March 4, 1968. See 88 S.Ct. 1045.

presiding, the appellee, William Davis, was convicted of having committed the crimes of robbery in the first degree, grand larceny in the first degree, and assault in the second degree. At no time after the impaneling of the jury did Davis have the assistance of counsel. On February 13, 1963, he was sentenced as a second offender to serve a term of from 30 to 60 years. The conviction was unanimously affirmed by the Appellate Division, People v. Davis, 21 A.D.2d 681, 250 N.Y.S.2d 375 (1964), and leave to appeal to the New York Court of Appeals was denied by Judge Fuld of that court on July 13, 1964.

On January 6, 1965 Davis's petition to Judge Foley for the issuance of a writ of habeas corpus was filed in the court below. Davis alleged that his constitutional right to have the assistance of counsel had been denied him at his trial. The petition was supported by affidavits of Attorney Ethel M. W. Mott, who had been appellee's retained counsel when the case was called and who continued to represent him during the remainder of that day and until ten jurors had been chosen; Attorney Thomas Brett of the New York Legal Aid Society; and Edward Davis, appellee's brother. On April 12, 1965 the State took the depositions of Judge Leibowitz and Assistant District Attorney Selzer, the prosecutor at Davis's trial. On June 21, 1965 the district judge held his hearing on the petition. Edward Davis testified on behalf of his brother and the State introduced the depositions of the judge and the prosecutor on behalf of the warden. The district judge, after a most conscientious consideration of the state trial record and the evidence before him found that the petitioner had indeed been denied a fair opportunity to have the assistance of counsel at the state court trial and that petitioner was there deprived of the protection of the Sixth and Fourteenth Amendments. Accordingly the judge is-

---

Gretchen White Oberman, Anthony F. Marra, New York City, for petitioner-appellee.

Joel Lewittes, Asst. Atty. Gen., Louis J. Lefkowitz, Atty. Gen., of New York; Samuel A. Hirshowitz, First Asst. Atty. Gen., for respondent-appellant.

Before WATERMAN, MOORE and ANDERSON, Circuit Judges.*

WATERMAN, Circuit Judge:

This is an appeal by the warden of a New York state prison from an order of Chief Judge Foley of the United States District Court for the Northern District of New York sustaining appellee's writ of habeas corpus after a hearing at which the warden was represented by the office of the State Attorney General. Judge Foley's careful opinion setting forth his findings and conclusions is reported at 252 F.Supp. 539 (1966).

On October 24, 1962, after a trial by jury in New York State Supreme Court, Kings County, Judge Samuel S. Leibowitz

---

* While the appeal was *sub judice* Judge Moore moved that all the judges of the court consider the case *in banc*. After distribution of the panel opinions and due deliberation thereon the judges refused *in banc* consideration, Chief Judge Lumbard and Judge Moore dissenting.

sued the order from which the warden appeals.

In his opinion Judge Foley has set forth the conspicuous occurrences that caused him to sustain the writ. In summary, however, the events before and during trial which relate to the petitioner's claim that he was denied a fair opportunity to have the assistance of counsel in the presentation of his defense are also set forth herein.

The events out of which the prosecution arose occurred early in the morning of April 15, 1962, and Davis was arrested later that day. The Kings County Grand Jury indicted him on May 17, 1962. On or about May 18, 1962 Mrs. Ethel M. W. Mott was retained by the defendant to represent him. The case was assigned to Judge Rinaldi on May 18th. On May 23rd it was placed on the regular calendar and marked for trial. On June 11th the case was set over at the request of the defendant. On July 31st it was marked off because a prosecution witness was on vacation. It was on the calendar on September 10th before Judge McDonald and was again set over at defendant's request. It was placed on the ready calendar on October 9th and assigned to Judge Leibowitz. On October 16th Davis and his retained counsel Mrs. Mott appeared before Judge Leibowitz who indicated to them that he wished to begin the trial of the case that day. Mrs. Mott requested an adjournment. She claimed she had not been notified of the trial date, that her witnesses were not available, and that she wished a copy of the indictment and of the complaint in the Magistrate's Court. Judge Leibowitz ordered that a jury be selected that afternoon, the tak-

ing of evidence to commence the next morning.

This pronouncement was followed by a conference in chambers at Mrs. Mott's request. Davis, Mrs. Mott, and Judge Leibowitz were present. After appropriate warnings the judge told Davis that the court would accept a guilty plea to robbery in the third degree. The defendant rejected this suggestion, refusing to plead guilty to any crime more serious than a misdemeanor.

After this conference the voir dire examination of the jury began. During this examination, which is not recorded under New York practice except where an objection is made, Mrs. Mott claims in her affidavit that she was "subjected to continual harassment and abuse by Judge Leibowitz in the presence of the jury and of my client." After she had exercised all of the defendant's peremptory challenges, Mrs. Mott challenged a juror for cause on the ground that the juror's daughter was an assistant district attorney. This challenge was disallowed and the trial was recessed until the next day.

When court reconvened in the morning of October 17th Mrs. Mott was allowed an extra peremptory challenge to remove the juror she had objected to for cause; the prosecution was not allowed a corresponding additional challenge. After the court excused another juror Mrs. Mott announced that Davis's family had requested her to withdraw from the case. Davis supported this, saying that he was discharging Mrs. Mott. Judge Leibowitz refused to permit a withdrawal, ordered Mrs. Mott to sit down by the defendant, and warned Davis that if he discharged Mrs. Mott he would have to proceed without counsel.[1] Despite this

1. The record reads:
  Mrs. Mott: Before you go any further, the family of the defendant William Davis has requested me to withdraw from the case.
  The Court: No. Sit down, please; not after the case has started. I have ruled. Take your exception.
  Mrs. Mott: Your Honor, also I am withdrawing from the case because they have requested—

  The Court: Do you want to talk faster so that you can get on the record? I am asking you to please desist.
  Mrs. Mott: I am making a record.
  The Court: You said the family want you to withdraw from the case, and I don't care about the family. I have ruled. Take your exception, and please sit down.

refusal by the court to permit her to withdraw or to recognize that she had been discharged, Mrs. Mott continued in her efforts. Judge Leibowitz did not hesitate to express his opinion of these tactics:

Now I find this morning this new gimmick to wreck this trial, that the defendant wants Mrs. Mott discharged, and he is firing her. This is another attempt to wreck the trial, to have the matter go over—to give the defendant an opportunity to get another lawyer so that the case would appear in another part, because the parts change here every month, and this lawyer is fully familiar with the practice.

If I permit this to happen, then it would be a mockery, and the Court would be subjected to indignities that it does not deserve.

The defendant may proceed. He will get a fair trial beyond cavil, but I will not permit these tactics which are intended to wreck this trial.

Bring in the jury.

Mrs. Mott: Please take this down. I wish to withdraw.

The Court: That is another thing. I will not permit you to withdraw.

Mrs. Mott: I want to withdraw on account of what happened yesterday.

The Court: I don't care what happened yesterday.

Mrs. Mott: Have you forgotten what happened yesterday?

The Court: Please be seated.

The Defendant: Your Honor, I don't wish to retain this woman any further.

The Court: Please keep quiet.

The Defendant: I fire this woman.

Mrs. Mott: Your Honor, I have been fired.

The Court: Will you please sit down. If the defendant does not want you to proceed, he has an absolute right to proceed himself. He is not going to stop this trial, right after we spent all this time selecting a jury, for whatever reason he may have.

Fill the box, please.

Madam, I have asked you to sit down.

Mrs. Mott: Your Honor, I have been fired.

The Court: Be good enough to sit down and obey the instructions of the Court. Thank you.

The trial record continues:

Mrs. Mott: Your Honor, I ask for a mistrial.

The Court: Please be seated.

Let the record show that counsel is now conversing with the defendant.

Madam, I have asked you to stay here.

Mrs. Mott: Your Honor, I am not representing this defendant any more.

The Court: I will ask you to sit here.

The Defendant: I do not wish to retain this woman as my counsel any further. She is fired.

The Court: Please sit down. I am wise to the game, and I would have to be a fool not to be cognizant of what is going on.

Mrs. Mott: I would like to say that I am taking exception to everything you say, and I would like it for the record.

The Court: Please sit down.

Proceed, please.

He has a right to fire his lawyer in the middle of the trial himself, but he has to carry on himself.

The Defendant: I am firing this woman.

The Court: Then you may proceed in your own behalf.

Mrs. Mott: Your Honor, that excuses me?

The Court: Will you please sit down?

Mrs. Mott: Your Honor—

The Court: Have I asked you to do something? Have I asked you to do something?

Mrs. Mott: Your Honor, please talk soft.

The Court: Please, have I asked you to do something. Please sit down, madam.

Mrs. Mott: May I sit somewhere else?

The Court: Sit right down there. The defendant may proceed himself.

The Defendant: I want a lawyer.

The Court: Proceed, Mr. District Attorney.

(Voir dire examination of prospective jurors continued by Mr. Selzer.)

The Court: The defendant may examine the jury.

The Defendant: I want a lawyer.

You will have to defend yourself unless you want Mrs. Mott to represent you.

The Defendant: I fired this woman.

(Jury returned to court room.)

The Court: You may proceed, Mr. District Attorney.

The prosecution made an opening statement to the jury, after which the court recessed the case and continued to question Mrs. Mott as to whether she had conferred with Davis's family. Mrs. Mott refused to answer, claiming she, herself, needed an attorney, and was "on the verge of collapse." The judge then permitted her to leave, saying: "Let the record show that counsel is running out of the courtroom."

Judge Leibowitz now faced the problem of when and how Davis was to have any new counsel. Questioning Davis, whom the judge ordered to be remanded for lack of bail, the judge learned that Davis wished to hire a lawyer though he did not have any particular lawyer in mind; he thought his family could afford to hire one for him and would do so.

The court then said:

Your family will go out and hire a lawyer. The lawyer will come in this afternoon, and if he wants a postponement, I will give him a postponement.

Then Davis's brother Edward, who had been present throughout the foregoing proceedings, was questioned by Judge Leibowitz. Edward indicated that he would have to raise money to hire a lawyer, and that he needed time. The judge gave him until the following morning to produce a lawyer and again indicated that he felt this was merely another Davis maneuver to delay trial so as

to have the case heard by a different judge than he.

The next morning, Thursday, October 18th, Edward Davis appeared in court and stated that he had been unable to secure an attorney for his brother. Judge Leibowitz adjourned the trial until the following Monday, October 22nd, telling Edward Davis to get a lawyer at once, to bring him back immediately to confer with the defendant, and to be prepared to proceed with the trial on Monday.

On Monday, October 22nd, Edward Davis again appeared before the court without having obtained any attorney for his brother. He stated that he had contacted several lawyers but their fees were too high. He declined Judge Leibowitz's offer of assigned counsel and claimed he was to contact another lawyer that afternoon. Mr. Thomas Brett, an attorney from the New York Legal Aid Society, happened to be present in the court house. The judge called Brett forward and gave him a summary of the proceedings to that date. He then offered Brett's services to Davis, and offered to permit an hour's adjournment in order for Brett to prepare the defense case. Mr. Brett states in his affidavit that he could not have accepted the case on these restrictive conditions, and if forced to represent Davis he would have moved for a mistrial on the ground that the events up to that time had been highly prejudicial to the defendant. However, he did not have to decline the assignment for the defendant refused to accept his services under the conditions the court had laid down. After this the court recessed the trial to Wednesday, October 24th, and told Edward Davis that he had a last two days in which to produce an attorney for his brother.

Edward Davis's efforts during his final two day period were no more fruitful than his previous attempts,[2] so, as

2. Edward Davis's affidavit recounts his attempts to get counsel from his first appearance in the courtroom until this Wednesday:
On Thursday I came to Court before 9 A.M. and spoke to Mrs. Mott. She told me she was not going on with the trial. I then went into the court room. Mrs. Mott told the judge she was withdrawing and Judge Leibowitz got very excited. After a while the judge asked if any of the defendant's family was in

the judge had ordered, the trial proceeded on Wednesday with the defendant appearing without counsel. The defendant did not acquiesce to this arrangement. For example, during direct examination of a prosecution witness the following occurred:

The Court: Does the defendant have any objection to the picture going into evidence?

The Defendant: I am only the defendant.

The Court: Do you object or don't you object? Which is it?

The Defendant: I object to everything because I have no representation.

The Court: Mark it in evidence. Pay no attention to the remark of the defendant, gentlemen, about him having no representation.

Later, in the midst of the defendant's presentation of his own case, the court made another offer of assigned counsel which was refused. The warden and our dissenting brother would make much of this refusal.

The Court: The jury has left the courtroom, and I will ask the defendant again:

Even at this late stage of the trial, the court is perfectly willing and eager to have you get the benefit of the assistance of counsel. You have steadfastly refused to cooperate. There has been a studied plan on your part and on the part of your brother, the cop, to wreck this trial, and you will not get away with it; possibly in the hopes that by the end of the month you will get some other Judge. I know what you are up to.

If you wish, I will have a member of the Legal Aid Society sit down and consult with you, and go over the mat-

the courtroom and my father and I stood up. The judge told me I had until the next morning to get a lawyer although I told him that wasn't enough time to find a good attorney to handle the case.

That day I went to Schermahorn Street in Brooklyn where I knew a number of attorneys had offices. I went into different attorneys' offices and talked to them about representing my brother. Only one man, a Mr. Heyman, was willing to take the case for $1500. I thought this was too much money and the next day I came back to court and told the judge I couldn't get a lawyer and needed more time. The judge gave me until Monday.

I started calling various lawyers and I got quoted various prices. One man told me $3000 and wanted me to mortgage my house. Two attorneys told me they wouldn't take the case because of Judge Leibowitz. One man said he would charge $1200 and we could arrange payment, but he wanted ⅓ down before he started. My father and I decided to take him.

On Monday I told the Judge I was going to be in touch with an attorney that afternoon who would take the case if I had his retainer, but that I needed time to raise the money. Judge Leibowitz said if we couldn't afford a lawyer, he would give my brother Le-

gal Aid and an adjournment for an hour to talk to him. I said we could afford to hire an attorney and my brother said he wanted the attorney I was getting. I was not permitted to talk to my brother at this time.

After court I went to Beneficial Finance Company in Brooklyn where I had a loan outstanding and tried to have it raised to cover the cost of ⅓ of the fee the lawyer told me he would have to have as a retainer. The Finance Company would not extend my loan. I am a correction officer with the New York Department of Correction and make $5020 a year. At that time I was a civilian policeman for the Navy, making about the same salary. I support my wife and three children. My father works in the Brooklyn Steel Warehouse and earns about $5500. a year. He supports his wife and four grandchildren. We own a house, but at that time had only owned it for a year and didn't have sufficient equity to borrow on it.

I then went to Manufacturers Trust Company to take out a loan but they needed 4 full working days to check credit and the judge had only given me until Wednesday. The Chase Manhattan Bank wanted 5 full working days to check credit.

This history was repeated by Edward Davis in his testimony before Judge Foley.

ter with you, and get his advice. You don't have to take it, but it is not going to cost you anything. If you want that, I will have that done immediately, and if you need a little adjournment for an hour or so to go into the matter thoroughly with him, I will be happy to accommodate you, to the end that if the case ends in a conviction, that you won't be in a position to holler that you were not treated fairly. I am giving you all the leeway and more than you are entitled to.

Don't for a minute think that you are fooling this old Judge with your tactics, because you are not.

Do you want the help of a lawyer from the Legal Aid Society? You don't have to use him if you don't want him, but you can have him just by saying yes.

What is it you want?

The Defendant: I don't want a lawyer.

Of course it is obvious that, at this stage of the trial after the state had put in its evidence, the defendant's statement that he didn't want a lawyer can only be considered as a rejection of the conditioned offer of assigned counsel, not a waiver of his right to counsel or an insistence upon his right freely to choose to conduct his own defense.

■ The defendant cross-examined the complaining witness and he presented several defense witnesses but, as one would anticipate, the record reveals his defense to be deficient in many respects compared with what might have been expected if he had had legal representation. He made no opening statement. He made no objection to any of the prosecution's direct examination. His cross-examination was of limited effectiveness due to the difficulty he encountered in formulating acceptable questions. And cross-examination was further hindered by his failure to make the demand any lawyer would make, a demand that the pretrial statements of the prosecution witnesses be handed over to the defense for cross-examination purposes. See People v. Rosario, 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881, 7 AL.R.3d 174 (1961). We agree with the court below that Davis's performance was generally "inept and amateurish" and the record discloses he was pathetically outmatched by his adversary, an experienced prosecutor.

■ We turn now to a consideration of the applicable case law. It is settled beyond question that due process requires that a defendant charged with having committed a felony be allowed representation by counsel. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Nevertheless, a defendant may not through a deliberate process of discharging retained or assigned counsel whenever his case is called for trial subvert sound judicial administration by such delaying tactics. United States v. Abbamonte, 348 F.2d 700 (2 Cir. 1965), cert. denied, 382 U.S. 982, 86 S.Ct. 557, 15 L.Ed.2d 472 (1966); Leino v. United States, 338 F.2d 154 (10 Cir. 1964); United States v. Bentvena, 319 F.2d 916 (2 Cir.), cert. denied, sub nom. Ormento v. United States, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963). And the right to have counsel of one's own choice may be waived by a defendant who fails to retain counsel within a reasonable time when he is financially able to do so. United States v. Arlen, 252 F.2d 491 (2 Cir. 1958). Moreover, we have recognized a right of a defendant to proceed without counsel and to refuse the representation of assigned counsel. United States ex rel. Maldonado v. Denno, 348 F.2d 12 (2 Cir. 1965); United States v. Plattner, 330 F.2d 271 (2 Cir. 1964). Though a defendant has a right to select his own counsel if he acts expeditiously to do so, Releford v. United States, 288 F.2d 298 (9 Cir. 1961), he may not use this right to play a "cat and mouse" game with the court, Releford v. United States, 309 F.2d 706 (9 Cir. 1962), or by ruse or stratagem fraudulently seek to have the trial judge placed in a position where, in moving along the business of the court, the judge appears to be arbitrarily depriving the defendant of

counsel. More particularly is this so when, during trial, the defendant discharges his counsel. Then, as we said in United States ex rel. Maldonado v. Denno, supra, 348 F.2d at 15: "There must be a showing that the prejudice to the legitimate interests of the defendant overbalances the potential disruption of proceedings already in progress, with considerable weight being given to the trial judge's assessment of this balance. United States v. Bentvena, supra, 319 F. 2d at 938; United States ex rel. Hyde v. McMann, supra, 263 F.2d at 943; United States v. Dennis, supra, 183 F.2d at 234." Finally, whether a defendant has been afforded an adequate opportunity to obtain a lawyer so as to be represented by counsel when the case is tried must be determined from the particular circumstances in that case; it cannot be decided by any mechanical test. See Ungar v. Sarafite, 376 U.S. 575, 589, 84 S. Ct. 841, 11 L.Ed.2d 921 (1964).

[redacted] In the particular circumstances of this case, the experienced trial judge below found from the record that the extraordinary performance of the state judge in intemperately abusing Mrs. Mott, defendant's retained counsel, before the introduction of any evidence justified the defendant in believing that he could not obtain a fair trial unless she were discharged. The district judge also found that Davis never waived his right to counsel and that he was not given an adequate opportunity to secure new counsel after Mrs. Mott left. Our independent study of the state record fully supports this finding below, and we agree completely with Judge Foley's analysis of the courtroom situation during the jury selection days. United States ex rel. Davis v. McMann, 252 F.Supp. 539, 541–543. Too, it should be observed on this point that with reference to these events Judge Foley heard oral testimony from one very important witness, Edward Davis, the defendant's brother, and had an opportunity to judge his demeanor and credibility. See Fed.R.Civ.P. 52(a).

Proceeding on the assumption that the Davis family was making a bona fide attempt to secure trial counsel for William we must examine the adequacy of the opportunities afforded by the trial judge to obtain that representation.

From the withdrawal of Mrs. Mott as Davis's retained counsel, Davis and his family were first given from Thursday morning until Friday morning to employ retained counsel, then until Monday morning, and then two more days, until Wednesday morning. While the total period included a Thursday afternoon, a Friday, a Monday and a Tuesday, and might have been adequate if taken as an aggregate, see Ungar v. Sarafite, 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964), but see United States v. Mitchell, 354 F.2d 767 (2 Cir. 1966), each of the three periods must be considered separately because Judge Leibowitz in each case gave no indication that the time he allowed might be extended beyond his firmly stated deadline.

[redacted] The *Mitchell* case, supra, presents a closely analogous situation to the present case. Mitchell, accused of wilful failure to report for induction into the Armed Forces, found it necessary to discharge his retained counsel shortly before his trial was scheduled to begin. He was given 5 days, from Wednesday to Monday, to retain new counsel, but he was unsuccessful. On Monday he refused court-appointed counsel, saying he needed time to retain another counsel of his own choice. The court proceeded with the trial. Our court held that the trial court erred in not granting the defendant more time to get retained counsel. Mitchell in retaining counsel had difficulties that are not present here, because he was charged with a most unpopular crime and his case involved difficult legal issues with "decided First Amendment overtones." But Davis faced a difficulty not present in *Mitchell*; the Davis family had marginal financial resources. In a time when the poor receive representation without charge and the well-to-do protect their interests by expending substantial sums to retain eminent counsel, it is not amiss for judges to remember the plight of the

wage earner who cannot afford to hire his champion without thought of the cost but who feels that even his slim pocketbook will enable him to select better representation, more attuned to his interests, than is available to him through court-appointed counsel. Moreover, Davis's case is not without substantial legal issues. The district court found that "There were evidentiary problems of consequence, particularly concerning an alleged letter written by defendant to the complainant asking the complainant to accept money from his parents, with ramifications of compounding a felony." 252 F.Supp. at 544. When all these circumstances are reviewed and consideration is given to Edward Davis's testimony relative to the problems his limited finances created for him when he sought to retain counsel, see footnote 2, supra, we cannot say that any of the three short periods granted by Judge Leibowitz, or all the periods in the aggregate, allowed enough time for the Davis family to secure retained counsel.

We agree with the district judge that appellee was not accorded his constitutional right to counsel by being given a reasonable opportunity to retain counsel of his own choice, and the order below is affirmed.

■ Although we affirm on the ground that Davis was not given adequate time to retain counsel of his choice, it might be useful to consider the situation which would have been presented if the trial judge had given Davis adequate opportunity to secure counsel and for some reason Davis did not obtain representation. While we find that the time given Davis in the present case was inadequate, we do not mean to imply that a defendant must be permitted to stall criminal proceedings, and particularly a criminal jury trial, merely because he claims to the court that he is attempting to employ counsel.

If after a reasonable period a defendant is unable to retain counsel he should be assigned counsel by the court, United States v. Bentvena, 319 F.2d 916, 936 (2 Cir.), cert. denied, sub nom. Ormento

v. United States, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963) unless he clearly and unequivocally indicates that he wishes to proceed without any counsel. United States ex rel. Maldonado v. Denno, 348 F.2d 12 (2 Cir. 1965); United States v. Plattner, 330 F.2d 271 (2 Cir. 1964). In the present case it is clear that Davis wished to employ retained counsel rather than accept assigned counsel but it is by no means clear that his refusals to accept assigned counsel indicated a desire to defend himself rather than indicating a strong preference for counsel of his own choice.

■ When a defendant is assigned counsel by the court the assignment must be made in a manner which will allow the assigned attorney time to present an adequate defense on behalf of his client, for otherwise the assignment is of negligible value; thus a defendant who knows the facts of his case may indeed be better off defending himself without an attorney than with an inadequately prepared one.

■ Examining into Judge Leibowitz's two offers of assigned counsel to Davis, the first, two days before the trial finally commenced, and the second during Davis's presentation of his defense, we note that both offers were made with the statement that there would be an adjournment of "an hour or so" within which assigned counsel would be expected to prepare the case, and both of these offers were refused by Davis. While it is entirely possible, perhaps even probable, that if Davis had accepted either offer of assigned counsel Judge Leibowitz would have granted counsel more time to familiarize himself with the case than the stated one hour, we cannot make such an assumption from anything that appears in the trial record. In a criminal case involving three counts, five witnesses, and several serious legal problems, the time to prepare the defense that the judge was allowing to an assigned counsel was, on the face of it, grossly inadequate. Indeed, Mr. Thomas Brett, the proposed attorney in at least one of the two offers, would have been

unwilling to take the case under such conditions.[3]

The order below appealed from is affirmed.

MOORE, Circuit Judge (dissenting):

In its technical accuracy, the majority's statement at the outset of its opinion, that "At no time after the impaneling of the jury did Davis have the assistance of counsel," is highly misleading. Since in my opinion, the decision of the court below and the majority here combine to approve a strategic pattern for defendants of the future to make a mockery of so-called "law and order" and the courtroom scene where some modicum of orderliness is supposed to prevail, I find it necessary to set forth at some length the events of 1962 as revealed in the State court record.

From date of arrest to date of trial, the facts as set forth in the majority opinion are chronologically correct. However, the only facts relevant to the issue before us are those which bear upon the claim of denial of the right to counsel. The opinion below and that of the majority here concentrate on the conduct of the trial judge and his actions in purportedly depriving the petitioner of his right to counsel. In the opinion of the court below, "The important question here is whether * * * this petitioner, against his wishes, was forced to trial without any counsel retained or assigned, when he insisted throughout he wanted a lawyer, * * *." To answer this question, the facts must be not only reviewed but also analyzed and interpreted. The judge being analyzed is a distinguished jurist on the Supreme Court of the State of New York who for many years had represented defendants in criminal cases in New York and Brooklyn with outstanding success and who for the past twenty years has served as a judge presiding principally over criminal trials in Brooklyn. The analyzing judges are federal judges from upper New York State, Connecticut and Vermont. The facts to be analyzed must come from the original State court record.

When the case was called for trial on October 16, 1962, Davis, unable to furnish bail, had been in jail for five months. During this period, he had been represented continuously · by counsel of his choice, a Mrs. Mott, apparently not a newcomer to the criminal courts. When Davis' counsel requested a further adjournment, the court denied it, saying "Not after five months." (Jury trial for Crimes, Am'd VI, U. S. Const. "the accused shall enjoy the right to a speedy and public trial, * * *.") After reviewing the adjournments since May (each side having made one or more requests) the court said that "in the light of all of these facts, the case must proceed to trial."

Unable to secure the requested adjournment, Davis' counsel said, "I don't have my witnesses here," to which the court replied, "I will give you an opportunity to get your witnesses." Counsel then wanted a copy of the complaint in the Magistrate's Court which had been offered to her the previous day. The court said that it was available. Counsel then asked for a copy of the indictment which the court assured her she

---

3. Mr. Brett's affidavit states:

"On October 25, 1962, I was directed by a Court attendant to appear in Judge Leibowitz's court room in connection with the trial in People v. William Davis, a robbery case. Judge Leibowitz offered to assign me to represent this defendant at his trial stating that he would give me an hour's adjournment to familiarize myself with the case. Under the terms and conditions laid down by Judge Leibowitz, namely his permitting me one hour's time to confer with the defendant before proceeding to trial, I would have found it impossible to have prepared the case. If the defendant had accepted me and Judge Leibowitz continued to adhere to the conditions of his offer, I would have refused the assignment. Moreover, even if the condition had not been adhered to, I would have demanded a mistrial because I had nothing to do with the selection of the jury and additionally I felt that what had transpired previously was most highly prejudicial to the defendant."

could have. All this after she had been representing a defendant in jail for five months. Counsel then requested "an adjournment until tomorrow" which the court granted, saying "We can select a jury this afternoon and go ahead tomorrow." The jury was selected, Davis' counsel participating therein, but it was not sworn in that day because of counsel's objection to a juror for cause. The court said, "Look up the law. If I find that she has a justifiable challenge, I will excuse the juror."

The next day the court asked Davis' counsel whether she had looked up the law, to which inquiry she responded, "I was sick last night." The court announced that it had looked up the law, was not sure that counsel was entitled to a challenge for cause, but that it would "exercise my [its] discretion and let you exercise another challenge." At this point Davis' counsel said, "Before you go any further, the family of the defendant William Davis has requested me to withdraw from the case," to which the court replied, "not after the case is started." Then followed a series of statements on the record which in part are adequately depicted by "The Defendant: Your Honor, I don't wish to retain this woman any further." * * * "The Defendant: I fire this woman." * * * "Mrs. Mott: Your Honor, I have been fired." * * * "The Defendant: I want a lawyer."

The jury, as selected, was then sworn. After the jury had retired, there was apparently some somewhat acrimonious discussion between court and counsel in which the court said that it would "not permit these tactics which are intended to wreck this trial." The People opened by reading the indictment after which a noonday adjournment was taken. Since Mrs. Mott was out of the case and since the jury had retired, the continued acrimony between Mrs. Mott and Judge Leibowitz is of no relevance to the right of counsel question but does support the court's comment that "You are giving the best evidence of how contumacious you are," to which Mrs. Mott replied,

"That's just me. I am an old Southerner."

Relevant, however, is the following colloquy:

The Court: Do you have money to hire a lawyer?

The Defendant: My family will get me a lawyer.

The Court: What lawyer do you want?

The Defendant: I will get a lawyer of my own choosing.

The Court: What lawyer do you want?

The Defendant: I don't know yet. I haven't got the money myself to retain him.

When they send him to me, and I see that he is adequate to defend my case properly, I will accept him.

From the courtroom activities of October 16th and 17th, Davis' and his counsel's tactics were most obvious—anything to avoid a trial in Judge Leibowitz's Part. The judge knew this; the record clearly reveals it. And so with the following comment by the court, a recess was taken until the next morning:

"That would be a fine how-do-you-do, to spend a good part of a day to select the jury, with twenty peremptory challenges that have been exercised by Mrs. Mott, and then at the last minute, to say, 'I don't want this lawyer,' and wreck the trial.

"You are barking up the wrong tree. But to avoid any difficulties, any tecnicalities, I am going to give you a chance to get another lawyer; but come in with a lawyer tomorrow morning. If not, the case will proceed without a lawyer. You are a cop. You know how to get a lawyer.

"Come here with a lawyer, and if I have to give the lawyer a little recess or adjournment, I will give him an adjournment to prepare the case; but the case will stay right here. If your game is to get this case out of Judge Leibowitz's hands, you are barking up the wrong tree."

The next morning, Davis' brother appeared and announced that he didn't have time to get a reputable lawyer. The court on the morning of October 18th excused the jury until Monday morning, October 22nd, advising the defendant that in the next four days he would have to get a lawyer or proceed without one.

On Monday morning, Davis' brother reappeared and announced that he had "contacted several lawyers, but their fee is too high so that I can't get one at this time." The court replied, "Then I will assign a lawyer." * * *

"The case was actually on trial, and during the trial he kicked his lawyer out.

"I gave you all this time to get another lawyer. I don't want the man to go ahead without a lawyer, but if he does not want me to appoint a lawyer and you don't want me to assign a lawyer, the case will have to go on without a lawyer.

"If you wish, I will assign the Legal Aid Society."

The court finding present a lawyer of the Legal Aid Society (Thomas Brett), gave him a brief background of the events subsequent to the opening of the trial and said to the defendant, "Do you want Mr. Brett to represent you? He is a capable lawyer of the Legal Aid Society." The defendant answered, "No, sir."

The court with discerning foresight then stated:

"All right, Mr. Brett. The defendant refuses your aid.

"In this Davis matter, there is no doubt in my mind that this is a patent attempt on the part of this defendant and his advisors, probably his brother who is a cop, to go through the trial and then claim that he was not represented by counsel of his choice. I don't think he should get away with it. There is no doubt in my mind that they are trying to jockey this case so that at the end of the term it will be tried before some other Judge.

"The case will stay right here."

Nevertheless, the court granted another two-day adjournment until Wednesday, the 24th, saying to the defendant and his brother:

"You now have until Wednesday. I will give you two more days. I am giving you all the leeway that I possibly can. I am stretching every point, so that if there is a conviction in this case, there won't be any shenanigans that the defendant did not have an opportunity to have a fair trial. Go ahead and get yourself a lawyer, but that will be the last chance."

On the 24th the defendant apparently had neither obtained counsel nor altered his refusal to have assigned counsel. The trial proceeded; the People opened; the defendant did not.

Consistent with the court's prediction, when the first exhibits, two photographs of a house, were offered and shown to the defendant, he said, "I object to everything because I have no representation."

*The State Trial*

*The People's Case*

The People first called the victim of the armed robbery, Frank McNicol. He told a story of meeting a girl at a Bar, going with her to a house, 42 Vernon Avenue, where she knocked on a window, the defendant opened the door, she asked about keys, the defendant said they were "by the sister," they left, obtained the keys, returned immediately, the defendant came out to the sidewalk, stuck a pistol in McNicol's back and the defendant and the girl took $95 from his person, he then found a policeman, they returned to the house where he identified the defendant who was then arrested.

The defendant cross-examined thoroughly and in meticulous detail (11 pages of the record) as to all the incidents described on direct and as ably as any seasoned criminal lawyer.

The next witness was Patrolman Alvin Knott, the arresting officer who testified that he went with McNicol (the complainant) to the house, 42 Vernon Avenue, knocked on the window and the defendant came to the door.

Again the defendant cross-examined with particularity as to identity and as to the woman.

This was the People's case.

*The Defendant's Case*

The defendant stated that he did not "desire to take the witness stand." He called as a witness, his father, also a William Davis. The father testified that McNicol came to his house, said that his (Davis') son had robbed him, that he was an airplane flyer and had to go out of town, that he wouldn't be there for the trial, that all he wanted was his money back, that he (Davis) told him that he didn't have any money, that McNicol read a letter which said that the defendant Davis did not want to face this charge and to go and see his father and mother and see if they would take care of him, that another son Oscar also present gave McNicol $20 on condition he wouldn't press the charges and would sign a statement that it was not a bribe, that McNicol signed the statement and took the $20.

The defendant then said that his other witness was not in court. The judge said that the defendant had had many days to prepare and that his other witnesses had been in court. Nevertheless, the judge said, "If you tell me where this woman lives, I will send somebody out there and bring her here, and if necessary, if she can be found within a reasonable time, I will even postpone the case to give you a chance to bring your witness here." When the defendant indicated that he wanted this procedure followed, the record discloses the following:

The Court: That shall be done, to the end that all your rights are protected; and if you give me any clue as to where the other woman lives, we will go out and fetch her and bring her down.

You have your father here. He knows Mrs. Mott undoubtedly, and he can get the address from Mrs. Mott if she has the address.

The jury retired and the court again addressed the defendant:

The Court: Even at this late stage of the trial, the Court is perfectly willing and eager to have you get the benefit of the assistance of counsel. You have steadfastly refused to cooperate. There has been a studied plan on your part and on the part of your brother, the cop, to wreck this trial, and you will not get away with it; possibly in the hopes that by the end of the month you will get some other Judge. I know what you are up to.

If you wish, I will have a member of the Legal Aid Society sit down and consult with you, and go over the matter with you, and get his advice. You don't have to take it, but it is not going to cost you anything. If you want that, I will have that done immediately, and if you need a litle adjournment for an hour or so to go into the matter thoroughly with him, I will be happy to accommodate you, to the end that if the case ends in a conviction, that you won't be in a position to holler that you were not treated fairly. I am giving you all the leeway and more than you are entitled to.

Don't for a minute think that you are fooling this old Judge with your tactics, because you are not.

Do you want the help of a lawyer from the Legal Aid Society? You don't have to use him if you don't want him, but you can have him just by saying yes.

What is it you want?

The Defendant: I don't want a lawyer.

After recess, a court exhibit was received in evidence, a sheet of paper containing the names of the witnesses requested by the defendant, namely, Marquetta Frost, and Geraldine Corry. The jury returned. The judge advised the defendant: "Mr. Davis, the witnesses that you desired are here in court. Would you like to talk to them individually and privately? I will let you do that." The defendant stated his desire to do so,

whereupon the judge said, "Take the defendant and the witness, Corry, into the robing room, and let him speak to her privately. He may interview her without the presence of the Court officers." The defendant acknowledged that he had interviewed the two ladies privately, and the trial recommenced.

Marquetta Frost said that she lived at 42 Vernon Avenue, that she was awakened by the police officer and complainant, who, upon seeing her after she had gotten up, said that she was not the girl connected with the case.

Geraldine Corry testified that she lived at 42 Vernon Avenue, that she delivered hair curlers to Marquetta Frost a little after twelve, that they were putting up their hair until twenty after one and that the defendant was asleep. To a prosecution motion to strike, the Judge, in denying it, said, "I want to give the defendant some leeway. He is not a lawyer."

At the defendant's request, the Judge recalled the complaining witness, McNicol. The defendant inquired as to the witness' understanding of the meaning of perjury, his place and duration of employment, his salary, his living arrangements with someone other than his wife, and the details of the robbery. He developed the fact that McNicol went with the girl he had picked up at the Bar for the purpose of having sexual intercourse with her.

The defendant then recalled the arresting officer who said that he remembered only the color of the defendant's shirt. The defendant stated that he desired to call no more witnesses and, after being advised of his right to take or decline to take the stand, declined. The court made the necessary motions to assure the defendant of his appellant rights.

During his summation, the defendant argued most plausibly that if he had committed the crime, why would he not have fled (as did the woman) instead of staying in his house and opening the door for the arresting officer. He pointed out inconsistencies in the description of his house and claimed a mistake in identity. Lastly, he said that the complainant was the victim of a prostitute. And on objection by the prosecution, the Judge ruled in the defendant's favor, saying, "It is his argument, and he has a right to make any argument and draw any inferences that he seeks to draw. You are within your rights."

The court charged accurately with respect to the elements of robbery, first, second and third degrees, and grand larceny, first degree, and assault, second degree. Apparently, it is not disputed that the charge was not fair, both as to law and factual summary, and that the court did not sufficiently stress that the jury must eliminate race and color from their deliberations. The Judge ended by saying, "The defendant is trying the case without a lawyer. Now let no man in the jury box be motivated in rendering a verdict in the slightest degree with the fact that he is trying his own case. That is his right. If he wants to try his own case, that is his business. It has nothing to do with whether he is guilty or innocent, nothing." The jury deliberated less than one hour and found the defendant guilty of robbery, first degree, grand larceny, first degree, and assault, second degree.

*The Opinion Below*

In summary, a federal district court judge has substituted his judgment for that of the five judges of the Appellate Division of the New York State Supreme Court, Second Department, and a judge (now Chief Judge) of the New York State Court of Appeals as to how the trial record should be read and interpreted. The judge implies that Judge Leibowitz should have gone beyond "the limits of ordinary patience" and to have carried "to an extreme, at times, an attitude of forbearance." In my opinion, Judge Leibowitz did both—and to an extreme. The judge characterizes as "inept and amateurish" the defendant's defense. Yet appellate judges, skillful as trial advocates with their advantage of reflective hindsight, would be hard put to point to a question unasked which would have aid-

ed the defendant. Despite the finding of the court below that throughout the record the defendant requested the assistance of counsel, there is not a single instance, other than previously mentioned, of such a request and there is his affirmative statement, "I don't want a lawyer."

It may be very well in theory to say that "the right to choose one's own counsel is a vital element in that [basic] right" but in practice when a jail case is on the calendar for trial, what is the trial judge to do were a defendant to state that Mr. A or Mr. B (naming two highly publicized criminal lawyers) are his choice, or that he cannot afford the best, or that only if he is released for a year on bail can he earn enough to pay for a lawyer or that his counsel is so occupied with other cases that only an adjournment of six months will permit him to be defended by counsel of his choice? These and many other examples are commonplace to the courtroom scene.

As for trial strategy, the result of the majority's opinion is a judicial declaration that a defendant has a constitutional right to counsel of his choice and the judge of his choice. Only when this combination is in unison can a defendant be tried. If he is unable to secure the counsel he desires, the judge must adjourn the case; if, when counsel is secured, the judge is not satisfactory, there must be further postponement until the wheel of trial assignment spins as the defendant would have it. Take the actual situation in the Kings County Supreme Court criminal trial calendar in October 1962. Eight judges were assigned to specific criminal parts—all Supreme Court judges, the court reorganization having become effective as of September 1, 1962. All had long judicial experience. Four had served for many years on the County Court (criminal cases). What should Judge Leibowitz have done? He could have said (and, according to the majority, in substance should have said): "I am sorry that you do not wish to have your case tried before me. I know that you know of my reputation, if you are con-

victed, for enforcing the laws as written by the Legislature by imposing sentences within the limits prescribed by the Legislature. However, let me know what judge you would like to have, and I will try to have him rearrange his calendar to accommodate you. As for counsel, you apparently do not desire Legal Aid or assigned counsel, and are not able to pay for high-priced counsel whom you believe possesses skill in direct ratio to his requested fee. Under these circumstances, I shall have to let you remain in jail until your desires are satisfied."

This seeming impasse should have been frequently encountered in the past, although each new court decision brings forth new defense tactics so that precedent is often of little value.

In United States ex rel. Higgins v. Fay, 364 F.2d 219 (2 Cir. 1966), the court held that a defendant who during the prosecution's case wished to discharge his Legal Aid counsel and "get me a paid lawyer" had been "unconstitutionally deprived of his right to counsel." The defendant there had made no effort to conduct a defense or participate in the trial.

In United States v. Mitchell, 354 F.2d 767 (2 Cir. 1966), the defendant accused of wilful failure to report for induction into the Armed Forces, before the trial commenced asked for time to obtain new counsel. The court held that it was an abuse of discretion for the trial judge to grant only five days to obtain counsel in a not "very simple case," with "decided First Amendment overtones" and involving "various intricacies of the Selective Service Law". The defendant there refused to participate, testify or call witnesses. Although the court held that the defendant's conduct did not constitute a waiver of his right to counsel, it did say (p. 769):

"The right to counsel cannot mean that a defendant may continually delay his day of judgment by discharging prior counsel or by persistently refusing to select a new lawyer or any lawyer to defend him. The exercise of the right to counsel must be balanced with the

necessities of sound judicial administration."

Curiously enough, despite Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), this court has given as serious consideration to the judicially created so-called constitutional right of a defendant to defend himself *in propria persona* as to the necessity of counsel.

In United States ex rel. Maldonado v. Denno and United States ex rel. DiBlasi v. McMann, 348 F.2d 12 (2 Cir. 1965), the court held that a defendant's rights had been invaded when he was not permitted in a State court to proceed without counsel. Yet even there the court pointed out that "Once the trial has begun with the defendant represented by counsel [as was the case here], however, his right thereafter to discharge his lawyer and represent himself is sharply curtailed" and that the right of self-representation must be exercised by "unequivocal request" before the jury is chosen because "At this stage there was [is] no danger of disrupting proceedings already in progress." And most applicable to the case now under review and in my opinion determinative is the statement that "On the contrary the trial judge would have been entirely justified, once their cases had been called, in insisting that the two men proceed to trial at once, with or without the lawyer who had been assigned to them" (p. 16).

This right of self-representation was also stressed in United States v. Plattner, 330 F.2d 271 (2 Cir. 1964). There the trial judge endeavoring to comply with *Gideon,* appointed Legal Aid counsel "because the petitioner was not schooled in the law." The court had some difficulty in reconciling "the right of the accused personally to manage and conduct his own defense in a criminal case" with the "now all but universal requirement of the assignment of counsel to indigent defendants"—a "development of a later generation and more enlightened views" but the older generation and less enlightened views won out because the trial judge was reversed for having insisted that the defendant's rights be protected by counsel.

The situation here is quite akin to that presented in Relerford v. United States, 309 F.2d 706 (9 Cir. 1962), where the defendant appeared without counsel, was twice granted continuances to obtain counsel, did not desire to have counsel appointed, had the benefit of the court designating a practicing attorney as an "advisor," proceeded to conduct his own trial and cross-examined witnesses. On appeal he claimed that he had not had the assistance of counsel for his defense. The court said (and in my opinion quite appropriately):

"We think it apparent from the record that after the mandate came down from this court, and until the case finally went to trial, Relerford was engaging in a cat and mouse game with the court, stoutly maintaining on the one hand that he could not take a pauper's oath to obtain court-appointed counsel, and at the same time not obtaining counsel for himself. The constitutional guarantee of the right of a defendant to have the assistance of counsel is not thus to be turned into a weapon whereby a defendant can prevent his case from ever being brought to trial" (p. 708).

In United States v. Arlen, 252 F.2d 491 (2 Cir. 1958), the defendant's counsel before the trial commenced had withdrawn because of the defendant's failure to pay the balance of his fee. The defendant did not desire a court-appointed lawyer but one "of profound ability who will take a personal interest in my case." The case was called for trial, the defendant there, as here, stating: "I would like to get my own lawyer." There was a day's adjournment after jury selection (here there were eight days). Judge Lumbard after recognizing that a defendant is entitled to a reasonable time to secure counsel said in the court's opinion: "he [the defendant] may not indefinitely postpone trial by continued applications for more time to seek representation. Whether additional time should be granted is within the

sound discretion of the trial court." The judge below here believed that "It is not my [his] province to question the quality of the evidence presented against the petitioner," but this "quality" was held by this court in *Arlen*, to be an important factor, the present Chief Judge saying that the defendant had "intelligently cross-examined government witnesses on several occasions", that the trial court had allowed him "great latitude in cross-examination and in his statements to the jury", and that the trial had been conducted by the judge with "scrupulous fairness." The trial record discloses that Judge Leibowitz here so conducted the trial. The conclusion was reached that the defendant (Arlen) "was granted all the protection of his rights which the Constitution, the Federal Rules and fair dealing require, and he was duly and properly convicted of an offense of which he was undeniably guilty."

Here the defendant presented an effective defense in a very simple case. The only issue was whether the jury believed the complaining witness or the story about his willingness to call off the prosecution if his stolen money were returned. The defendant's defense was based upon the theory as disclosed in the letter written by the complainant. The substance of the letter was received in evidence. To say that a "trained lawyer" was needed to keep this material from the record is to say that a lawyer would and should have kept his defense from being presented. Had such an occurrence taken place, the case would be before us on an incompetence of counsel theory. And despite the majority's statement that "the record reveals his defense to be deficient in many respects", the deficiencies do not withstand analysis, "He made no opening statement." (Many skilled defense counsel do not as a matter of good strategy.) "He made no objection to any of the prosecution's direct examination." (The majority would be hard put even after reflection to couch a proper objection to a single question.) "[T]he difficulty he encountered in formulating acceptable ques-

tions." (The eleven pages of cross-examination disclose no such difficulty; rather they evince an accurate awareness of exactly what he wanted to ask). "[P]athetically outmatched by his adversary, an experienced prosecutor." (There is nothing in the record as to the prosecutor's experience; furthermore, the simplest type of question prevailed, "What did he do? What did he say?")

I would also dissent from the majority's characterization of court-appointed counsel and that even a "slim pocketbook" will secure "better representation" than such counsel would afford. Skilled criminal defense lawyers in this circuit and in the State Courts respond willingly to court requests. This is scarcely an age, or metropolitan New York a place, in which to view with pathos "the plight of the wage earner who cannot afford to hire his champion" in contrast to the "well-to-do" who "protect their interest by expending substantial sums to retain eminent counsel." If this be true, we might as well scrap any effort conscientiously to apply the Criminal Justice Act.

The Judge below in my opinion mistakenly interpreted *Gideon*, supra, and particularly Mr. Lewis' best-seller "Gideon's Trumpet." A trumpet is a strident instrument heard above all other instruments in the orchestra. It is very effective when well played but can also produce very sour notes. It must also be remembered that the same instrument in the hands of Joshua wrought great destruction. If the trumpet continues to blare as the majority would play it, in my opinion the walls of "law and order" in the courtroom will indeed come "tumbling down."

Unless the law for the trial judge is clarified, the pattern for the Davises of the future is clear. "I want a lawyer. I won't accept assigned or Legal Aid counsel. I can't afford to pay for the kind of counsel I desire. If at any time I don't have 'complete confidence' in my lawyer, the trial must cease until I get another lawyer and remember, Mr. Judge, if I have to proceed with a lawyer, I can

always claim that I have a constitutional right to represent myself." And to think that so many distinguished jurists in committees and otherwise are spending so much time and effort in talking about, and writing concerning, criminal justice. Their words and theories will be so quickly nullified in the actual courtroom scene where the defendant is advised of his rights and makes his election.

No expression is more misleading than the much used and over-used phrase "with his eyes open." Undoubtedly the expression is intended to convey the idea that the person whose eyes are thus open fully understands all the consequences of his election to proceed with or without counsel. In theory, the trial judge is assigned the responsibility of performing a task upon which trained psychologists would differ. An initial step would have to be a determination of the I. Q. because obviously the understanding level would vary widely between an I. Q. of 70 and an I. Q. of 125. The judge would then have to invade the defendant's Fifth Amendment privileges because unless he knew the facts of the alleged crime, he would not know whether it was a "very simple" case or one involving so many legal technicalities that only the most skilled counsel was called for. But even were these examinations conducted and the trial judge exercised that "discretion" granted to him by appellate courts in some cases and denied in others by the overriding of that discretion, the defendant would still be free to assert in the habeas corpus proceedings of the future that his eyes may have been wide open but his mind was befogged.

I would, therefore, hold that Judge Leibowitz did everything conceivably possible to afford the petitioner the protection to which he was entitled; that petitioner, knowing the facts, conducted his defense as well as, if not better, than counsel assigned, appointed or paid; and that the federal courts should not dedicate themselves to exercising supervisory powers over the courts of the State of New York, which throughout the years from trial courts through Appellate Divi-

sions and the Court of Appeals have shown by their decisions that they should be entitled to the greatest of respect.

Lastly, the judge below felt that the clarion sound of Gideon's trumpet "would be drastically muted if this conviction and severe sentence are allowed to stand." I, in turn, believe that the orderly enforcement of our laws in the courtroom will be substantially impaired if every contretemps between judge and counsel which a defendant thinks may be adverse to him entitles the defendant to discharge his counsel and thereby obtain a new trial. One might well ask: should there be any limitation on the number of wrecked trials or can such postponements of finality be endless? As to the "severe sentence," although appellate courts (as yet) in theory do not review sentences, the record reveals than from 1943 to 1962 the defendant had a record of twelve adult arrests and three previous juvenile encounters with the law. Starting in 1943 (robbery with knife); 1945 (stolen automobile); 1945 (assault and robbery); 1947 (stolen automobile); 1949 (possession of marijuana); 1951 (petit larceny); 1953 (petit larceny); 1954 (petit larceny); 1955 (possession of heroin); 1955 (theft of mail); 1957 (possession of cocaine); 1959 (possession of narcotic drugs); 1960 (grand larceny —reduced to attempted petit larceny); 1960 (possession of heroin and hypodermic needle); 1961 (possession of heroin). In view of this record, Judge Leibowitz was unwilling to release the defendant upon society after a short sentence. It is to be hoped that for the sake of society, Judge Leibowitz' predictions do not come true. In any event, I wish to take no cooperating part in this so obvious scheme to frustrate the law.

Although I recognize that uniformity of opinion between the various panels of this court is impossible of achievement, I do believe that the opinion of the majority here is in conflict with the law in this circuit as declared most recently (February 1967) in United States v. Llanes, 374 F.2d 712, where a panel

(Lumbard, Ch.J., Friendly and Hays, C.J.J.) said (717):

"We and other courts of appeals have repeatedly made clear that the right to counsel 'cannot be * * * manipulated so as to abstruct the orderly procedure in the courts or to interfere with the fair administration of justice.' United States v. Bentvena, 319 F.2d 916, 936 (2 Cir.), cert. denied, Ormento v. United States, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963); United States v. Abbamonte, 348 F.2d 700 (2 Cir. 1965), cert. denied, 382 U.S. 982, 86 S.Ct. 557, 15 L.Ed.2d 472 (1966); Cleveland v. United States, 116 U.S. App.D.C. 188, 322 F.2d 401 (D.C.Cir.), cert. denied, 375 U.S. 884, 84 S.Ct. 157, 11 L.Ed.2d 114 (1963); United States v. Burkeen, 355 F.2d 241 (6 Cir., 1966), cert. denied, 384 U.S. 957, 86 S.Ct. 1582, 16 L.Ed.2d 553 (1966). Judges must be vigilant that requests for appointment of a new attorney on the eve of trial should not become a vehicle for achieving delay."

I would reverse the granting of the writ.