IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 12, 2002 Session Heard at Memphis

**STATE OF TENNESSEE v. EARLEY STORY**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 97-08560      John P. Colton, Jr., Judge**

_____

**No.  W2001-00529-CCA-R3-CD  - Filed September 13, 2002**

_____

The appellant, Earley Story, was convicted in the Shelby County Criminal Court of one count of selling not less than one-half ounce nor more than ten pounds of marijuana, a Class E felony.  The appellant was sentenced to one year of incarceration in the Shelby County Jail, which sentence was immediately probated.  On appeal, the appellant raises the following issues for our review: (1) whether the trial court erred in failing to conduct a hearing on the appellant's pro se motion alleging a failure to afford him a speedy trial; (2) whether the trial court wrongly forced the appellant to trial with unwanted counsel, which counsel were appointed without any evidence that the appellant was unable to employ counsel of his choosing; and (3) whether the trial court erred in admitting purported transcripts of tape recordings.  Upon review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and ALAN E. GLENN, J., joined.

John E. Herbison, Nashville, Tennessee (on appeal), and Michael J. Gatlin and Rebecca Coffee, Memphis, Tennessee (at trial), for the appellant, Earley Story.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; William L. Gibbons, District Attorney General; and Rhea Clift, Dan Woody and Tom Hoover, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

        In July 1997, the appellant was indicted by the Shelby County Grand Jury on three counts of selling not less than one-half ounce (14.175 grams) nor more than ten pounds (4535 grams) of marijuana.  The indictment alleged that the offenses occurred on January 9, 1997, January 15, 1997, and January 22, 1997.  The appellant was subsequently arrested and a trial was commenced

on December 8, 1997. A jury in the Shelby County Criminal Court acquitted the appellant of the offenses alleged to have been committed on January 9, 1997, and January 15, 1997, but found the appellant guilty of the sale of marijuana on January 22, 1997.

At trial, the State's witnesses, Detective Carl Harrison, undercover narcotics agent Jeffrey Butler, and cooperating individual Alfredo Shaw, related that, on three occasions in January 1997, Agent Butler and Shaw went to 1349 Standridge in Memphis to purchase marijuana from the appellant. On January 9, 1997, the first of the three encounters, Agent Butler and Shaw met with Detective Harrison at a Church's Chicken Restaurant where Detective Harrison equipped Agent Butler with a microcassette recorder and five hundred dollars ($500) with which to make the controlled buy. Agent Butler and Shaw proceeded to 1349 Standridge where they saw the appellant in front of the residence. Shaw exited the undercover vehicle and approached the appellant. He introduced the appellant to Agent Butler and asked the appellant if they could obtain one-half of a pound of marijuana for five hundred dollars ($500). The appellant instructed Agent Butler and Shaw to "make the block." Complying with the request, the pair circled the block and then returned to 1349 Standridge. Upon their return to the residence, the appellant gave them marijuana in a plastic freezer bag in exchange for five hundred dollars ($500).

Following the transaction, Agent Butler and Shaw met with Detective Harrison and gave the detective the recorder and the bag containing the controlled substance. Detective Harrison weighed the substance and found it to weigh 149.0 grams. Friderica Saharovici tested the substance at the University of Tennessee Toxicology Laboratory and determined that the substance was marijuana.[1]

Detective Harrison, Agent Butler, and Shaw testified at trial that, on January 15, 1997, they met at Church's Chicken to outfit Agent Butler with a microcassette recorder and to provide Agent Butler with five hundred dollars ($500) to make the drug purchase. Agent Butler and Shaw returned to 1349 Standridge where they witnessed the appellant standing across the street at a residence located on Fairfax. At the Standridge location, Agent Butler and Shaw were approached by "Little Red," also known as Etienne Harmon.[2] Harmon entered the undercover vehicle and instructed Agent Butler and Shaw to drive around to Fairfax if they wanted to make a deal. The three men proceeded to 1329 Fairfax where the appellant was waiting. Harmon got out of the vehicle and informed the appellant that they wanted another half-pound bag of marijuana. Agent Butler witnessed Harmon give the appellant five hundred dollars ($500) in exchange for the marijuana. Harmon immediately transferred the marijuana to Agent Butler. Agent Butler and Shaw left the residence, met Detective Harrison, and again gave Detective Harrison the contraband and the recorder. Detective Harrison determined that the substance weighed 206.07 grams and Saharovici confirmed that the substance was marijuana. As previously noted, the appellant was acquitted on charges relating to these two alleged transactions.

---

[1] At trial, Saharovici was deemed "qualified as an expert in toxicology."

[2] Harmon was deceased at the time of trial.

The State presented testimony regarding a third arranged buy on January 22, 1997. Detective Harrison, Agent Butler, and Shaw repeated their established procedure and met at Church's Chicken where Detective Harrison supplied Agent Butler with a microcassette recorder and eight hundred and fifty dollars ($850). Agent Butler and Shaw again returned to the residence at 1349 Standridge. When they approached the residence, the appellant and Dante Dale instructed the pair to proceed to Mok's Grocery for the transaction. The two men did so, and waited a few minutes for the appellant and Dale to arrive. Shortly thereafter, the appellant and Dale, driving a "grayish-brown Cadillac," met Agent Butler and Shaw behind Mok's Grocery. Dale was driving the vehicle and the appellant was in the front passenger seat. Agent Butler and Shaw got into the rear passenger compartment of the vehicle. Agent Butler gave the appellant eight hundred and fifty dollars ($850) for the purchase of one pound of marijuana. The appellant gave the packaged marijuana to Dale, who in turn passed the marijuana to Shaw. Agent Butler and Shaw returned to the undercover vehicle. They immediately proceeded to a meeting with Detective Harrison and relinquished possession of the recorder and the marijuana. Detective Harrison testified that the substance weighed 307.0 grams. Saharovici again attested that the substance "contain[ed] tetrahydrocannabinol which is the active ingredient in marijuana."

At trial, the appellant denied involvement in any of the transactions. The appellant testified that, at the time of the alleged January 9, 1997, transaction, he was at his sister's house picking up a prescription for his mother. The appellant's sister supported the appellant's version of events. The appellant further contended that, at the time of the January 15, 1997, drug deal, he was at home with his family, either in bed or working on his car. Both the appellant's wife and daughter corroborated the appellant's alibi. Additionally, the appellant contended that he was home at the time of the January 22, 1997, transaction. The appellant's wife maintained that she did not recall the appellant leaving home on January 22, 1997. Moreover, the appellant asserted that, prior to the commencement of the instant legal proceedings, he had never met Etienne Harmon or Dante Dale.

As a result of his conviction for the January 22, 1997, transaction, the trial court imposed a sentence of incarceration for one year in the Shelby County Jail, but suspended the sentence and placed the appellant on probation. On appeal, the appellant argues that the trial court should have held a hearing on the appellant's pro se motion demanding a speedy trial, the trial court erred in allowing into evidence transcripts of the drug sales, and he alleges that "[t]he trial court wrongly forced [him] to trial with unwanted counsel, which counsel were appointed without any evidence that the [appellant] was unable to employ counsel of his choosing." We shall first address the appellant's complaints regarding the trial court's appointment of counsel.

## II. Analysis
### A. Appointment of Counsel

Regarding his complaint concerning counsel, the appellant argues, "In the case sub judice, the trial court relieved a retained attorney of the [appellant's] choosing and sua sponte appointed counsel. . . . The record does not show that [the appellant] at any time sought appointment of counsel, nor that he claimed to be unable to afford retained counsel."

Events surrounding the appointment of counsel resulted from a motion filed by the appellant requesting that he be incarcerated until his trial. On July 19, 1999, a hearing was held on the appellant's motion. At the hearing, the appellant was represented by retained attorney Jeffrey Rosenblum, "the second lawyer, perhaps even the third, who has been on this jacket."[3] The appellant testified in support of his request to have the trial court incarcerate him until the time of trial. While the appellant was on the witness stand, Rosenblum asked the appellant if his request for incarceration was against the advice of appellant's counsel, to which question the appellant replied, "You're not my lawyer." The following colloquy then occurred:

Counsel: Are you firing me then?

Appellant: Correct.

Counsel: Okay.

Court: Are you appointed or–

Counsel: No, Your Honor. He's hired me.

The trial court advised the appellant that by firing his attorney he was causing additional delays in his case. The appellant replied, "I'll represent myself." In response to the appellant's complaints regarding the inadequacies of counsel, the trial court stated:

Well, it appears that we've had at least two lawyers involved in this case representing Mr. Story, and the case is set for trial. . . . We've got to get somebody to represent Mr. Story. I can't force you to do this Mr. Rosenblum because you are a private lawyer in the case. And of course, the Court will not do that. The Court is going to allow you under the statements made by Earley Story to be – to withdraw[] from this case.

The trial court considered appointing a public defender to represent the appellant, but declined such appointment upon being informed that the appellant had a pending civil lawsuit in which the public defender's office was involved. The trial court then inquired as to the appellant's employment status. In response, the appellant stated that he was employed. Without further discussion, the court informed the appellant that it would appoint "Mr. Guy" to represent the appellant. The following day, on July 20, 1999, the trial court entered an order appointing Michael J. Gatlin as the appellant's

---

[3] The record reflects that, on April 30, 1998, the court allowed Stephen R. Leffler to withdraw as counsel for the appellant. On March 22, 1999, the court allowed Steve Temple to withdraw as counsel and Jeff Rosenblum was substituted as counsel for the appellant. On July 19, 1999, the trial court granted the appellant's motion to relieve Rosenblum as counsel of record. As a result of Rosenblum's withdrawal, Michael J. Gatlin was appointed as the appellant's attorney on July 20, 1999. Additionally, on September 21, 1999, the court appointed Rebecca Coffee as co-counsel for the appellant.

counsel, noting that "the Court ascertained that the Defendant is financially unable to employ counsel."[4] The appellant issued no complaint as to the trial court's appointment of counsel.

On November 5, 1999, the appellant filed a pro se motion to dismiss Gatlin, alleging ineffective assistance.[5] Subsequently, on November 8 and November 9, 1999, a hearing was held. Gatlin "urge[d] the Court . . . to adopt Mr. Story's motion." The appellant stated that he did not wish to represent himself, but explained that he did not want Gatlin to continue to represent him. As a result of these comments, the trial court began to question the appellant about his reasons for not hiring another attorney. The appellant contended, "I haven't had a chance to hire, I've been trying to. . . . I could hire a lawyer in Memphis. . . ." The appellant specifically complained that "[b]ecause of the political nature [of my case], I had four lawyers and for some strange reason they fail to work aggressively on my behalf."[6] The appellant also alleged that Gatlin could not represent him because of a conflict. The trial court dismissed the appellant's allegation as unfounded and stated:

> I've heard the defendant, Mr. Story, say that he does want representation. And, he's had four lawyers before. And, it's [m]y thought that he's trying to further, he's saying that we have delayed the case. This Court finds that he has delay[ed] the case by causing these lawyers so many problems that they don't want to represent him. And, he's had private lawyers and he's had appointed lawyers. And, we're set to go to trial December the 6th.
> . . . .
> I don't care whether he cooperates with [counsel] or not. [Gatlin,] [y]ou're going to have to do the best you can. I don't care whether he wants you to represent him. He doesn't want these other four people to represent him either. And, we're going to trial on December the 6th whether he cooperates with you or not.
> . . . .
> Mr. Story is not going to be, [m]y history with Mr. Story is that he's not going to be satisfied with anybody representing him. And, he's going to, he's going to be represented by you and we're going to trial on December the 6th whether he likes it or not.

Again, the appellant's sole complaint appears to be that the trial court appointed counsel to represent him without first conducting an evidentiary hearing to determine his indigency. Initially, we note that the United States Constitution and the Tennessee Constitution both guarantee an accused the right to be represented by counsel during a criminal trial. See U.S. Const. amend. VI;

---

[4] No order was entered appointing "Mr. Guy" as the appellant's attorney, nor does the record contain any further reference to "Mr. Guy."

[5] The record also reflects that the appellant made an oral motion to dismiss Gatlin on the Friday before the hearing.

[6] The appellant was employed as a Shelby County Jailer prior to his arrest in this case.

-5-

Tenn. Const. art. I, § 9. Additionally, "[t]he right to counsel includes the qualified right to the counsel of one's choice." State v. Parrott, 919 S.W.2d 60, 61 (Tenn. Crim. App. 1995). In the instant case, the appellant did not request the appointment of counsel. However, he repeatedly maintained that he did not wish to proceed pro se, but he had not "had the chance" to hire counsel after firing his previous attorneys. Again, following the appellant's firing of Rosenblum, the court appointed counsel without conducting a prior indigency hearing. In connection with this issue, we note that a trial court has the "inherent power to control the administration of justice." United States v. Gallop, 838 F.2d 105, 108 (4th Cir. 1988); see also United States v. Dunegan, 251 F.3d 477, 478 (3rd Cir. 2001). Moreover, the trial court has wide discretion in matters regarding the appointment of counsel; thus, the trial court's actions will not be overturned on appeal absent a clear abuse of that discretion. State v. Rubio, 746 S.W.2d 732, 737 (Tenn. Crim. App. 1987).

When a criminal defendant alleges the inability to afford counsel and requests the appointment of counsel, the court "shall upon inquiry make a finding as to the indigency of the party pursuant to the provisions of Tenn. Code Ann. § 40-14-202. The court shall enter an order appointing counsel upon a finding that the defendant is indigent." Tenn. Sup. Ct. R. 13 § 1(e). However, Rule 13 also states that "[t]he failure of any court to follow the provisions of this rule shall not constitute grounds for relief from a judgment of conviction or sentence." Id. at (j). Tennessee Code Annotated section 40-14-202(a) (1997) provides:

> In all felony cases, if the accused is not represented by counsel, and the court determines by the manner provided in subsection (b) that the accused is an indigent person who has not competently waived the right to counsel, the court shall appoint to represent the accused either the public defender . . . or . . . a competent attorney licensed in this state.

Additionally, Tennessee Code Annotated section 40-14-202(b) instructs that

> [w]henever an accused informs the court that such accused is financially unable to obtain the assistance of counsel, it is the duty of the court to conduct a full and complete hearing as to the financial ability of the accused to obtain the assistance of counsel, and, thereafter, make a finding as to the indigency of the accused.[7]

Thus, prior to appointing counsel for the appellant due to the appellant's indigency, the trial court should have first held a hearing to establish the appellant's indigency.

Regardless, the court's error in failing to hold an indigency hearing prior to appointing counsel for the appellant was harmless. Tenn. R. Crim. P. 52(a). Notably, the trial court found that the appellant was deliberately undermining the legal process by repeatedly "firing" his attorneys. "'[A] defendant may not through a deliberate process of discharging retained or assigned

---

[7] Interestingly, our courts have concluded that Tennessee Code Annotated section 40-2015, the precursor statute to Tennessee Code Annotated section 40-14-202, applied only to the appointment of counsel for indigent defendants, not to the appointment of counsel for non-indigent defendants. See Glasgow v. State, 461 S.W.2d 25, 25-26 (Tenn. 1970); see also State v. Armes, 673 S.W.2d 174, 177 (Tenn. Crim. App. 1984); State v. Dubrock, 649 S.W.2d 602, 605 (Tenn. Crim. App. 1983).

counsel whenever his case is called for trial subvert sound judicial administration by such delaying tactics.'" State v. Chadwick, 450 S.W.2d 568, 570 (Tenn. 1970) (quoting United States ex rel. Davis v. McMann, 386 F.2d. 611, 618 (2nd Cir. 1967)). In other words,

> "the right to retain counsel of one's own choice is not absolute. The right 'cannot be insisted upon in a manner that will obstruct an orderly procedure in courts of justice, and deprive such courts of the exercise of their inherent powers to control the same.'"

State v. Zyla, 628 S.W.2d 39, 41 (Tenn. Crim. App. 1981) (quoting United States v. Burton, 584 F.2d 485, 489 (D.C. Cir. 1978)). Furthermore, our supreme court has recently observed:

> [W]hen discussing a non-indigent defendant who fired his attorney in open court and thereafter repeatedly protested about going to trial without a lawyer, we recognized that even "[t]hough a defendant has a right to select his own counsel if he acts expeditiously to do so . . . he may not use this right to play a 'cat and mouse' game with the court. . . .'" The idea that the right to counsel may not be used to manipulate or toy with the judicial system applies equally to indigent and non-indigent defendants.

State v. Carruthers, 35 S.W.3d 516, 549 (Tenn. 2000), cert. denied, 533 U.S. 953, 121 S. Ct. 2600 (2001) (citations omitted). In a similar vein, the United States Court of Appeals for the Second Circuit has suggested, "[i]f after a reasonable period a defendant is unable to retain counsel he should be assigned counsel by the court unless he clearly and unequivocally indicates that he wishes to proceed without any counsel." Davis, 386 F.2d. at 620 (citations omitted). In the instant case, the trial court appointed counsel to assist the appellant after he repeatedly denied that he wished to represent himself.

We also observe that the appellant had many opportunities to object to the trial court's appointment of counsel and failed to do so until the conclusion of trial. Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Although the appellant complained before trial concerning the alleged ineffective representation of Gatlin, he made no protest regarding the trial court's appointment of counsel in general. Additionally, the appellant failed to secure additional counsel after firing Rosenblum even though he had ample opportunities to do so. The appellant also had the opportunity to retain counsel between his November 9, 1999, motion and the time of trial. This court has asserted that "the failure to retain counsel by a defendant who can afford an attorney is properly regarded as a waiver of the right to the assistance of counsel." Dubrock, 649 S.W.2d at 606; see also Davis, 386 F.2d. at 618 ("[T]he right to have counsel of one's own choice may be waived by a defendant who fails to retain counsel within a reasonable time when he is financially able to do so."). Furthermore, at no time in these proceedings has the appellant alleged that he was not indigent at the time counsel was appointed. To the contrary, the appellant filed a motion on November 9, 1999, requesting the transcription of audio tapes in the possession of the State and alleging that the State should pay for the transcription because "Defendant is indigent." Moreover, the record clearly

reflects that counsel were zealous advocates on the appellant's behalf, and succeeded in achieving acquittals for the appellant on two of the three counts against him.   This issue is without merit.

### B.  Speedy Trial

The appellant also complains that the trial court erred in dismissing his pro se motion for speedy trial without conducting an evidentiary hearing.  Initially, we note that the appellant filed pro se motions demanding a speedy trial, while he was represented by counsel.  It is well established that

> [an appellant] does not have a constitutional right under the State or Federal Constitution to participate In propria persona in his own defense and simultaneously to be represented by participating counsel.
>
> . . . .
>
> The choice is his; he represents himself or he is represented–one or the other, but not both.

State v. Burkhart, 541 S.W.2d 365, 371 (Tenn. 1976); see also State v. Muse, 637 S.W.2d 468, 470 (Tenn. Crim. App. 1982).  Thus, the trial court did not err in refusing to hold an evidentiary hearing on the speedy trial issue.  Cf. State v. Jackie F. Curry, No. E2000-02475-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 586, at **19-20 (Knoxville, Aug. 2, 2001), perm. to appeal denied, (Tenn. 2001).

Nevertheless, appellant's argument is without merit.  We note that "[t]he right to a speedy trial arises under the Sixth Amendment to the Constitution of the United States made applicable to the State by the Fourteenth Amendment . . . and Article 1, § 9 of the Constitution of Tennessee."  State v. Bishop, 493 S.W.2d 81, 83 (Tenn. 1973).  In analyzing the speedy trial issue, four factors are important: "the length of the delay, the reason for the delay, the defendant's assertion of the right, and the prejudice suffered by the defendant from the delay."  State v. Utley, 956 S.W.2d 489, 492 (Tenn. 1997) (citing Barker v. Wingo, 407 U.S. 514, 530, 92 S. Ct. 2182, 2192 (1972)).

"The right to a speedy trial attaches at the time of arrest or indictment, whichever comes first, and continues until the date of the trial."  State v. Vickers, 985 S.W.2d 1, 5 (Tenn. Crim. App. 1997).  A delay of one year or longer will trigger an inquiry into a speedy trial violation.  Id. The appellant asserts that he was arrested on January 31, 1997, but his trial was not commenced until December 8, 1999.  The record contains no verification of the appellant's arrest date.  However, the record does reflect that the indictments were returned against the appellant on August 7, 1997.  Thus, the delay between indictment and trial was slightly more than two years.  In Vickers, this court found that a delay of three years and nine months was not a presumptive speedy trial violation.  Id. Additionally, our supreme court has previously concluded that a "total delay of a little over two years is not per se extreme and is not such a length of delay that from this fact alone we would presume prejudice."  Bishop, 493 S.W.2d at 85.  Accordingly, we must examine the other factors involved.

> The second factor, the reason for delay, generally falls into one of four categories: (1) intentional delay to gain a tactical advantage over the defense or delay designed to harass the defendant;  (2) bureaucratic indifference

or negligence; (3) delay necessary to the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in, by the defense.

State v. Wood, 924 S.W.2d 342, 346-47 (Tenn. 1996) (footnotes omitted). In the instant case, the record is somewhat unclear as to the reason(s) for the delay because the trial court entered a summary order denying relief. However, we find compelling the trial court's finding that "[the appellant] has delay[ed] the case by causing these lawyers so many problems that they don't want to represent him." We agree with the trial court's conclusion that many, if not all, of the delays were the fault of the appellant. This factor weighs against the appellant.

While the appellant claims that he asserted his right to a speedy trial on numerous occasions, the record contains only two motions demanding his right to a speedy trial, which motions were filed in early November 1999. However, we also note that, on July 19, 1999, when the appellant was still represented by retained counsel Rosenblum, counsel informed the trial court that "[the case] has never been continued at the request of Mr. Story. He has always wanted his trial." Thus, the appellant did assert his right to a speedy trial, and soon thereafter, a trial was held. This factor weighs in favor of the appellant. See Vickers, 985 S.W.2d at 6.

Finally, we must determine whether the appellant was prejudiced by the delay. Wood, 924 S.W.2d at 348. Based upon the record before us, we cannot conclude that the appellant suffered any appreciable prejudice by the delay in prosecution. Significantly, the appellant was acquitted on two of the three charges against him. Additionally, the appellant was not incarcerated while awaiting trial. See Bishop, 493 S.W.2d at 85. After evaluating the applicable factors, we conclude that appellant is not entitled to relief on this issue.

## C. Transcripts

The appellant also complains that the trial court erred by admitting transcripts of the audio-taped drug transactions because there was no "proper foundation" laid and the trial court did not issue "clarifying or limiting instruction(s) as to the jury's proper consideration of such transcripts."[8] Specifically regarding the lack of foundation, the appellant contends that "[no] witness testified that he had compared the transcripts with the tapes to insure the accuracy of the transcripts." It is well settled that "the decision to admit or exclude evidence is left to the discretion of the trial judge and his decision will not be disturbed unless it is arbitrarily exercised." Taylor v. State, 814 S.W.2d 374, 377 (Tenn. Crim. App. 1991).

Initially, we note that the appellant raised no objection to the admission of the audio tapes of the three incidents. In fact, in numerous pretrial hearings, the appellant was adamant that the audio tapes themselves be admitted into evidence. The State introduced the audio tapes at trial through Agent Butler, who attested to the accuracy of the audio tapes and carefully explained the events transpiring on the tapes as they were played for the jury. Agent Butler explained that, while

---

[8] While we address this issue in terms of the admission of all of the transcripts, the appellant focuses much of his complaint on the transcript of the January 22, 1997, transaction, the sole charge on which the appellant was convicted.

the appellant's voice was possibly on the tape documenting the January 9, 1997, transaction, the appellant did not speak during the January 15, 1997, or January 22, 1997, transactions.

Later, the appellant cross-examined Detective Harrison regarding the contents of the audio tapes. Detective Harrison responded that he could not remember the exact contents of the audio tapes; however, the transcripts of the audio tapes would accurately reflect the events. The appellant repeatedly asked Detective Harrison if a copy of the transcripts could be obtained. Specifically, the appellant asked, "So if we took a break later on, you'd be able to get ahold of that transcript so we could all see it?" The detective replied that obtaining the transcripts "[s]houldn't be any problem" because they should be on file with the Shelby County Sheriff's Department. Following a short break, the State, on redirect examination, attempted to introduce the transcripts of the tapes through Detective Harrison. The appellant objected to the transcripts on the basis that they were not supplied during discovery. The appellant made this objection, and only this objection, to the admission of each of the three transcripts. The trial court overruled the objection, finding that the defense had opened the door to the introduction of the transcripts. As the appellant's objection to the admission of the transcripts is based upon different grounds on appeal, we must conclude that the appellant has waived this issue because "a defendant may not object to the introduction of evidence on one ground, abandon this ground, and assert a new basis or ground for the objection in this Court." State v. Aucoin, 756 S.W.2d 705, 715 (Tenn. Crim. App. 1988).

As his second complaint regarding the transcripts, the appellant argues that the trial court erred in failing to give a limiting instruction following the admission of the transcripts. Notably, at no time did the appellant request that a limiting instruction be given regarding the use of the transcripts.[9] Because of the appellant's failure to request such an instruction, the appellant has also waived this argument. See Tenn. R. App. P. 3(e); State v. William Lewis Houston, No. M1999-01430-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 936, at *23 (Nashville, Dec. 7, 2000), perm. to appeal denied, (Tenn. 2001).

Despite waiver, the appellant asks this court to address the issues regarding the transcripts as plain error. Tenn. R. Crim. P. 52(b). Generally, this court has cautioned that the only errors that should be addressed as plain error pursuant to Rule 52(b) of the Tennessee Rules of Criminal Procedure are errors "that 'seriously affect the fairness, integrity or public reputation of judicial proceedings' when necessary to prevent a miscarriage of justice." State v. Adkisson, 899 S.W.2d 626, 639-40 (Tenn. Crim. App. 1994) (footnotes omitted). In other words, such error must have "had an unfair prejudicial impact which undermined the fundamental fairness of the trial." Id. at 642. In analyzing plain error, this court considers the following factors:
> "(a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached; (c)
> a substantial right of the accused must have been adversely affected;

---

[9] Specifically, there was no contemporaneous request for a limiting instruction nor was there a request for a limiting instruction prior to the trial court's issuing the jury instructions. The record reflects that no limiting instruction was given.

(d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting Adkisson, 899 S.W.2d at 641-42). Notably, "the presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283. Moreover, "'[a]n error 'may be so plain as to be reviewable under . . . Rule 52(b), yet the error may be harmless and therefore not justify a reversal.'" Adkisson, 899 S.W.2d at 642 (footnote omitted).

> Concerning the admission of the transcripts, we note that "tape recordings and compared transcripts are admissible and may be presented in evidence by any witness who was present during their recording or who monitored the conversations, if he was so situated and circumstanced that he was in a position to identify the declarant with certainty, and provided his testimony in whole, or in part, comports with the other rules of evidence."

State v. Reed, 845 S.W.2d 234, 238 (Tenn. Crim. App. 1992) (quoting State v. Coker, 746 S.W.2d 167, 172 (Tenn. 1987)); see also State v. Jones, 598 S.W.2d 209, 223 (Tenn. 1980). On redirect examination, the State asked Detective Harrison how the transcripts were prepared. Detective Harrison replied,

> We listened to the original tape. We set Alfredo Shaw and Agent Butler down, and they listened to the original tapes and got with the other agent or secretary, and they began to go through the tape and type down what was said on the tapes.

Detective Harrison then proceeded to read the contents of the transcripts to the jury.

> The following colloquy occurred on recross-examination:
> Appellant: We, sitting here, don't have any way of knowing what you've got in front of you is actually what this impartial transcription person would have written down, do we?
>
> Detective Harrison: You could play the tape.
>
> Appellant: If we play the tape, that's actually a reflection of what happened; correct?
>
> Detective Harrison: That's correct.

Detective Harrison further asserted that he was present for the transcription of all three audio tapes. Agent Butler earlier testified that the audio tapes accurately reflected the events in question. However, although Detective Harrison monitored the transactions, he did not testify that he personally compared the audio tapes to the transcripts to verify their accuracy. Accordingly, because the State failed to properly lay a foundation for the admission of the evidence, the trial court should

not have allowed the transcripts into evidence.  See State v. Cameron, 909 S.W.2d 836, 850 (Tenn. Crim. App. 1995); State v. Robert Bacon, No. 03C01-9608-CR-00308, 1998 Tenn. Crim. App. LEXIS 31, at *33 (Knoxville, Jan. 8, 1998).

Moreover, "[i]t is well-settled in Tennessee that a transcript of a tape may be given to a jury where the jury is instructed that the tape, and not the transcript is the actual evidence." State v. Barnard, 899 S.W.2d 617, 623-24 (Tenn. Crim. App. 1994); see also State v. Bawana M. Carter, No. 02C01-9808-CC-00253, 1999 Tenn. Crim. App. LEXIS 808, at *10 (Jackson, Aug. 9, 1999) (stating that "a trial judge should offer a cautionary instruction to the jury instructing the jurors that the transcript is merely to aid them in consideration of the evidence of the recording itself").  We note that the appellant is correct that, upon the admission of the transcripts, the better practice was for the trial court to instruct the jury that the audio tapes themselves were the evidence to be considered, not the transcripts.[10]

However, we conclude that, although the trial court erred, the errors were harmless. The transcripts contained no information which was not related at trial, in detail, by Agent Butler and Shaw.  The transcript of the January 22, 1997, transaction did not attribute any speech to the appellant.  Moreover, the appellant thoroughly cross-examined Detective Harrison and was able to elicit from the witness that the audio tapes themselves more accurately reflected the events in question.  This issue is without merit.

### III.  Conclusion
Finding no reversible error, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE

---

[10] For example, this court previously approved of the following cautionary instruction in State v. Mosher, 755 S.W.2d 464, 469 (Tenn. Crim. App. 1988):
> "[T]he tape is the evidence, the transcript is an aid for you in understanding the tape.  But the evidence itself is the tape and not the paper.  So if there's any difference, you will in all events rely on the . . . tape itself."