J-S34030-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JAMES MICHAEL SWIFT | : | |
| | : | |
| Appellant | : | No. 860 WDA 2023 |

Appeal from the Judgment of Sentence Entered June 28, 2023
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0010274-2019

BEFORE:   DUBOW, J., LANE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LANE, J.:                    **FILED: April 10, 2025**

James Michael Swift ("Swift") appeals from the judgment of sentence entered following his convictions of arson-endangering persons, arson-inhabited building, and two counts of arson-endangering property.[1]   We affirm.

A detailed recitation of the facts is not necessary.  Previously, Swift was in a romantic relationship with the victim, Patricia Culligan ("Culligan").  Swift acquired power of attorney over Culligan's finances and often stayed at her row home, located at 1502 Ridge Avenue, North Braddock, Pennsylvania.  Once the relationship ended, Culligan made multiple demands that Swift release his control over her finances and vacate her home.  Swift did not

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 3301(a)(1)(i), (ii), (c)(2).

comply with these demands. On July 4, 2019, Swift set fire to Culligan's home, causing substantial damage to it and the home's two adjoining residences.

We now review in detail, and in chronological order, the procedural history relevant to two of Swift's issues on his appeal: the trial court's finding that his dilatory conduct resulted in the forfeiture of counsel, and the denial of his Pa.R.Crim.P. 600(A) motion.

On July 19, 2019, police charged Swift with each of the above-listed crimes. The trial court placed Swift on a nonmonetary bond, requiring him to check in with "pretrial services," or the adult probation office's electronic monitoring unit, once per week. N.T., 8/4/22, at 6; *see also* N.T., 9/15/22, at 22. Swift filed a motion for the appointment of counsel, and the trial court referred him to apply with the Allegheny County Public Defender's Office. Swift thereafter applied to the P.D.'s Office, who declined to represent him as he was currently suing the office in relation to its prior representation of him. The P.D.'s Office filed a motion requesting the court to appoint counsel for Swift.

In January 2020, the trial court appointed conflict counsel, Brandon Herring, Esquire ("Attorney Herring"). Due to the COVID-19 general statewide judicial emergency, the court continued Swift's trial numerous times.

On the first listed trial date following the statewide emergency, October 13, 2021, the Commonwealth and Attorney Herring appeared in court, but Swift did not. The trial court noted that Attorney Herring had filed a motion

for a continuance.[2]  *See* N.T., 10/13/21, at 2.  Attorney Herring explained that it was "possible" his office informed Swift that trial was in fact continued and thus he did not have to attend.  *Id*. at 2-3.  Attorney Herring then requested that if the court were to deny a continuance, that it grant Swift an additional twenty-four hours to appear in court.  *See id*. at 2.  The Commonwealth did not object, but noted, "This case has been going for quite a long time. . . . Swift is a difficult individual."  *Id*. at 3.  The trial court held the continuance motion in abeyance pending Swift's appearance within twenty-four hours.  Swift did not appear within this time period, and thus the court issued a warrant for his arrest.

According to the trial court, it lifted Swift's warrant on October 26, 2021, and rescheduled trial for March 30, 2022.  *See* Order, 2/17/23, at 4.  Meanwhile, the Commonwealth assigned a different assistant district attorney to prosecute this case.  On March 30, 2022, the date set for trial, the Commonwealth requested a continuance due to the newly-assigned attorney's pre-existing scheduling conflict.  The trial court granted the continuance and rescheduled trial to May 24, 2022.

On May 24, 2022, the rescheduled date for trial, the Commonwealth moved for another continuance.  The trial court noted there were "several conversations with counsel regarding" the Commonwealth's "difficulty" with proceeding with trial that week.  N.T., 5/24/22, at 3.  The Commonwealth

---

[2] The certified electronic record transmitted on appeal does not include this motion.

explained: (1) in late April, it learned that Culligan and her daughter were unavailable beginning May 25th — the following day — due to a preplanned trip; (2) the Commonwealth had requested jury selection to begin earlier, so that the two witnesses could give testimony before leaving; but (3) Attorney Herring's schedule could not accommodate this. *See id*. at 3. The Commonwealth also proposed a trial continuance to the following week, in June 2022, but this conflicted with both the trial court's and defense counsel's schedules.

Attorney Herring objected to a continuance, but stated that if the trial court were to grant it, his schedule allowed an earliest trial date of September 26, 2022. *See id*. at 3-4. Attorney Herring further related that he did not wish to reassign the case to another attorney, as he was "very familiar with [Swift's] case" and "developed a pretty good rapport" with Swift. *Id*. at 4.

The trial court granted the Commonwealth's motion for a continuance. The court also found the Commonwealth exercised due diligence to prevent delay, where it had contacted the court "several weeks" earlier, "as soon as" it learned of a potential delay. N.T., 5/24/22, at 4. As the trial court additionally agreed that it was in Swift's best interest that Attorney Herring continue representing him, it rescheduled trial for September 26, 2022 — the earliest date available for both parties. *See id*. at 6.

Thereafter, at a bond modification request hearing on August 4, 2022, the Commonwealth sought to revoke or modify Swift's nonmonetary bond, or to implement electronic home monitoring. The Commonwealth cited Swift's

recent arrest for theft, receiving stolen property, and harassment in an unrelated case, and his alleged "ongoing attempts to intimidate these victims or witnesses." N.T., 8/4/22, at 3-4. A representative of "pretrial services" testified and similarly recommended that Swift be placed on electronic home monitoring with total restriction. *Id*. at 6-7. Over Attorney Herring's objection, the trial court modified the bond and imposed electronic home monitoring, thus restricting Swift from leaving his residence, except to seek legal counsel for each of his pending charges. *See id*. at 7-8, 13-14. Notably, this monitoring required Swift to obtain advance permission from "pretrial services" before leaving his residence. *Id*.

Four days later, Swift filed a *pro se* motion for an emergency bond modification. The trial court recognized this *pro se* filing was a legal nullity,[3] but as Attorney Herring adopted the motion, it conducted a hearing on August 15, 2022. Relevantly, a representative of "pretrial services" testified that Swift had several unauthorized leaves since the court modified Swift's bond, nine days earlier, to include home monitoring:

> [Swift] just does whatever he pleases . . .. He will do side jobs or go to seek counsel. It has been explained to [Swift] from his probation officer that he must have approval for windows [of time for leave] prior to him exiting the residence. It just doesn't seem that [he] understands this. [Swift] has expressed multiple times that these [restrictions] are violations of his rights and that he should be permitted to do the things that he wishes.

---

[3] *See Commonwealth v. Williams*, 151 A.3d 621, 623 (Pa. Super. 2016) (affirming that hybrid representation is not permitted in Pennsylvania and that *pro se* motions submitted while a defendant is represented by counsel have no legal effect and thus constitute legal nullities).

N.T., 8/15/22, at 4. Swift's probation officer similarly testified to this behavior, indicating that although Swift notified him of his intentions to leave his residence, Swift acted on these intentions regardless of whether the officer granted him permission to do so. *See id*. at 7-8.

The trial court denied Swift's motion to modify the conditions of his bond. *See id*. at 20. Relevantly, the trial court once more explained the conditions of the electronic home monitoring to Swift, and he responded that he understood them. *See id*. at 20-29. The trial court additionally instructed Swift to not file documents *pro se* while represented by counsel. *See id*. at 31.

On September 15, 2022, eleven days before his scheduled September 26, 2022, trial, Swift filed another *pro se* motion for emergency bond modification. On the same day, the trial court convened a hearing. Attorney Herring stated he was not aware of the *pro se* filing and advised the trial court of a deterioration of the attorney-client relationship:

> Your Honor, [Swift] contacted my office earlier this week. I was on COVID leave. This is my first day back. [Swift] demanded that we make his file available to him to review and that a different attorney be made available for consultation. It's not entirely clear to me. I did bring my assistant who could testify as to her interactions with [Swift].
>
> I was contacted, and I said that if [Swift] wanted his file, he was free to come and pick it up and he could represent himself. I don't have the resources available, and frankly, [Swift] makes *pro se* filings, he disregards the advice that I give him, and I don't feel obligated to respond to his increasingly unreasonable requests, like making my office available for him in order to — basically,

he's stopped by the office very, very frequently without scheduling appointments.

So, Your Honor, [Swift] did elect to retrieve his file. He has everything in the case that I had. I was unaware of that *pro se* filing, so I haven't reviewed it, but I would submit that [Swift] wants to represent himself in this matter, and I would defer to him.

N.T., 9/15/22, at 3-4.

The trial court asked Swift whether he wished to proceed *pro se*. **See** **id**. at 7. Swift stated that he did not wish to be unrepresented at trial, and believed Attorney Herring was an "excellent lawyer," but he was not satisfied with the level of communication between himself and Attorney Herring. **Id**. at 7-8. Swift also stated he received an email from Attorney Herring that he was "at the end of his line" with Swift and that he did not want to represent Swift. **Id**. at 7. Swift continued:

I am about to go into a trial, and I've never even seen the evidence against me. I kept trying to see the evidence, and . . . review the file, [but Attorney Herring] doesn't have time. It's not his fault he's got so much work to do. So I kept trying to help prepare for the case. . . .

* * * *

. . . I've been patiently waiting for this to go to trial for over three years. I don't know who's making the continuances or what's going on with my case. There's lack of communication that concerns me. So I'm not trying to fire [Attorney] Herring. I think he's trying to dump me as a client, according to what I ascertained out of the e-mail.

**Id**. at 7-8. The trial court again asked if Swift wished to be represented by Attorney Herring, and Swift responded that he did. **See id**. at 10.

Attorney Herring responded as follows:

- 7 -

[J]ust for a little bit of clarification here, . . . and I have my assistant here who has a recording of a voice mail. It wasn't just that [Swift] was insisting on coming to the office. He demanded to be let in to review his file, and he demanded to have another attorney review it with him.

I've always been in the position that if [Swift] would just schedule an appointment, we can speak, but for whatever reason, [Swift] elects not to do that. The suggestion there's been a lack of communication with [Swift] and my office is laughable. . . .

\* \* \* \*

We're in constant e-mail contact. He calls my office sometimes two or three times a day to speak with my assistant. We've been attending to his needs in terms of electronic home monitoring. It's . . . getting to the point where I was concerned for the office, that I wasn't going to be there and I had a potentially upset person who was insisting on coming to the office. I don't like to set the office up for those kinds of situations when I'm not available. [Swift] was advised that I wasn't available and ill. So issuing demands is not really a way to have a conducive attorney-client relationship, which is the only language that [Swift] has been speaking of late, whether it's through e-mails or phone calls or things of that nature.

[I]t sounds like the court wants me to continue representing [Swift]. I will be happy to schedule an appointment with him next week to discuss his case, but I'm not going to be in a position where demands are issued to me and he just appears out of nowhere at my office, because in addition to having other cases, I have administrative responsibilities. I just can't be available at the drop of a hat.

[Swift] sent me an e-mail during a homicide trial asking me why that was interfering with his potential summary trial. So, I mean, this level of respect I'm getting from [Swift], and that's why I was somewhat prickly on the subject of reviewing his file while I was ill.

I'm glad [Swift] thinks that I'm a capable attorney, but I mean I think there is kind of a deeper issue there . . . . I've already refused to file several motions on the case that he believes are of

merit and that I don't, so, you know, we've butted heads on those issues in the past, but I mean I can't be expected to be in a position to be available to him at the drop of a hat. I just can't. I don't think any attorney can.

N.T., 9/15/22, at 13-15 (unnecessary capitalization omitted).

Attorney Herring also played a voicemail his office received from Swift, transcribed as follows:

> Courtney, this is [Swift]. I want to come there on Tuesday whether [Attorney] Herring's there or not and to review my file and talk to any attorney that's available. I'm being micromanaged by probation officer's supervisor who wants communication from you that I'm coming there immediate every time [*sic*], and I was told by you that he did not do that. He was telling me I need to have it done. I have less than ten business days to prepare for this trial, and it's going to become critical. . . .
>
> * * * *
>
> I intend to come there Tuesday morning whether [Attorney] Herring is there or not. Okay? I want to review my file and discuss with any attorney that's available if so. Okay? I'm not going to have — I don't want this thing postponed again. I've been waiting over three years for a trial. All right?
>
> I'm sorry about this. This is the micromanaged constraints he's putting on me. Based on this holiday [*sic*], I have to come there Tuesday. If I don't get permission, I'm going to come anyway, and then if I end up in jail, I end up in jail. This guy is reaching, overstepping and asking for something that he shouldn't be asking for.

*Id*. at 18-19.

A representative from "pretrial services" confirmed that Swift continued to engage in numerous unauthorized leaves. *See id*. at 22-24. Swift did not dispute Attorney Herring's nor the "pretrial services" representative's statements. The trial court addressed Swift as follows:

- 9 -

[Trial Court]: Here's my perspective to the extent I was not clear. It is not your decision to make what your windows are in terms of meeting with your counsel. [Q]uite frankly, one of two things is going to happen in the next few days, because I'm not going to permit — I thought I was clear. Maybe I'm not. Maybe I have a lack of clarity.

[Swift]: You were extremely clear, Your Honor, and I've been trying to do everything to toe the line, I mean, to the letter as it was explained to me.

[Trial Court]: No [Swift], you're not. What you're doing is engaging in a pattern of creating your own window before it's necessary by showing up at your lawyer's office, saying you're going to go there whether you have an appointment or not and then indicating that that's somehow a window. That is not a window. That is you leaving and going somewhere that you have not been permitted or authorized to go. And [Attorney] Herring will sit down — I know he will — and reasonably meet with you to prepare your case for trial.

Now, there's only two options here, because I could tell you right now, whether you agree with it or not, you're not going off electronic confinement prior to September 26th. So one of two things happens here, because I . . . really don't want to put everybody in the position where you have to defend yourself while you're incarcerated in the Allegheny County Jail, but that's where we're headed, because unless you have got — I'll just make it as easy as possible. Don't communicate with [p]retrial [s]ervices about a window that you want. You communicate and [Attorney] Herring has to approve it. Understand?

N.T., 9/15/22, at 26-27. Swift stated that he understood and requested that he continue to work with Attorney Herring. Thus, the trial court did not appoint new counsel.

Six days later, Swift filed a *pro se* motion to dismiss Attorney Herring as his counsel due to, *inter alia*, alleged ineffectiveness and lack of communication. Attorney Herring filed a motion to withdraw as counsel as

- 10 -

well, averring that Swift continued to arrive at his office unannounced and act "dilatory," "insulting," and "hostile" with him and his assistant, and thus he believed the attorney-client relationship had deteriorated and he could no longer ethically represent Swift. Motion to Withdraw as Counsel, 9/21/22, at unnumbered 1.

On September 26, 2022, the scheduled date of trial, the trial court held a hearing to determine the nature of the attorney-client relationship. Attorney Herring stated:

> [On September 21, 2022, Swift] was scheduled to come to my office. At [4:00 a.m.,] he sent an email to both me and my assistant detailing a number of complaints in relation to my representation that I interpreted as veiled insults and a breakdown of the attorney-client relationship.
>
> We had a very brief meeting[, forty minutes prior to the meeting's scheduled time. Swift] advised me . . . that he was going to file a motion to have me dismissed as his counsel [and h]e apparently did so. . . .
>
> [Y]our Honor having advised [Swift] on numerous occasions that you would not entertain *pro se* filings, I filed a motion to withdraw to bring the matter before the court.
>
> * * * *
>
> Your Honor, other than to note for the record that I disagree with every assertion [Swift] makes in his motion to dismiss legal counsel, I think that it provides sufficient evidence to establish that the attorney-client relationship has deteriorated to the point that it is beyond being reconciled. . . .

N.T., 9/26/22, at 3-4 (unnecessary capitalization omitted).

The trial court granted Attorney Herring's motion to withdraw and stated that trial would not proceed that day. The court informed Swift that it would

appoint another attorney, but instructed him to correct his conduct and "understand the scope and the reasonable parameters that exist in any attorney-client relationship." *Id*. at 9-10. Swift stated that he understood and that he "want[ed] to cooperate with an attorney." *Id*. at 13.

Four days later, the trial court appointed George Saba, Esquire ("Attorney Saba"), as counsel for Swift. In October 2022, the court held another bond review hearing, at which Attorney Saba learned that Swift did not have counsel to represent him in his pending theft case. *See* N.T., 10/4/22, at 3-6. Consequently, Attorney Saba moved to be appointed for that matter as well, and the trial court agreed. *See id*. at 7-8. The trial court additionally reinstated the original conditions of Swift's bond, removing his electronic home monitoring, and thus only requiring him to report to "pretrial services" in-person once per week. *Id*. 8-11.

Six weeks later, on November 15, 2022, Attorney Saba filed a motion to withdraw as counsel, citing a breakdown in the attorney-client relationship. In December 2022, the trial court held a hearing on the motion, where Attorney Saba explained:

> In an attempt to communicate with [Swift] surrounding the [theft] case, which is not this case in particular, [Swift] did not care to — to my advice [*sic*]. And in the course of the conversation we had on November 14, [Swift] indicated that he wished to proceed in representing himself.
>
> I, in turn, then filed the immediate motion. I do not believe that [Swift] will listen to my advice and my counsel, but would rather have me do specifically what it is he wants to do, regardless of whether or not it is legally sound.

- 12 -

And I don't believe that I can be . . . representing him effectively under those conditions.

N.T., 12/12/22, at 3.

Swift stated he "had communication problems" with Attorney Saba, and that Attorney Saba didn't "want to do what [he] asked him to do[.]" *Id*. at 5-6. Swift reiterated he wanted to be represented by "effective counsel, not [by] somebody that's going to ignore [him,] backstab [him,] or throw [him] under the bus." *Id*. at 7. Swift argued that each of his counsel has been ineffective by refusing to present unidentified exculpatory evidence. *See id*. at 10. Attorney Saba responded that he was willing to present some evidence at the preliminary hearing in Swift's theft case, but not other evidence because it was not relevant. *See id*. at 12.

The trial court granted Attorney Saba's motion to withdraw and scheduled a status conference to determine if Swift would be represented at trial. In concluding the hearing, the trial court opined:

> [I]t is fundamentally unreasonable and unfair for me to continually put esteemed members of this bar in the position of having to deal with you, when it has been made repeatedly clear, at multiple hearings, that you will not listen to advice, . . . not listen to their counsel, [and] not understand that when you have an attorney, they make critical decisions about how best to proceed with matters such as the admission of evidence or what to present.
>
> They're obligated to communicate with you. Certain decisions are ultimately only yours to make. But there's no way any attorney can have an effective attorney[-]client relationship with you, at least one that this court's going to appoint, under these circumstances.

- 13 -

*Id*. at 14. (unnecessary capitalization omitted).

At the status conference on January 9, 2023, the trial court found that Swift forfeited his right to counsel due to his history of dilatory conduct. ***See*** N.T., 1/9/23, at 4. As a result, the court informed Swift that if he could not retain an attorney, it would appoint him standby counsel for trial. ***See id***. at 8. The next day, the court appointed Jeffrey Wasak, Esquire ("Attorney Wasak"), as standby counsel.

Approximately two weeks thereafter, Swift filed two *pro se* motions: a motion to amend the conditions of his bail and a motion to dismiss pursuant to Rule 600(A). We note that at this time, approximately three and one-half years had passed since the filing of the criminal complaint. On February 8, 2023, the trial court conducted a hearing, at which Swift appeared *pro se* with Attorney Wasak as standby counsel. The trial court denied both motions.

Subsequently, Swift's case was reassigned to another trial judge. On March 11, 2023, with Swift's consent, Attorney Wasak entered his appearance as court-appointed counsel for Swift,[4] and represented him throughout the jury trial, which commenced on March 27th. The jury found Swift guilty of one count each of arson-endangering persons and arson-inhabited building, and two counts of arson-endangering property. The last two counts pertained to the two row homes adjoining Culligan's home.

_____

[4] ***See*** Trial Court Opinion, 1/24/24, at 8.

On May 1, 2023, Attorney Wasak filed a motion to withdraw, citing Swift's request for him to do so. On June 28, 2023, while Attorney Wasak continued to represent Swift, the trial court imposed a sentence of five to ten years' imprisonment for arson-endangering persons, and two consecutive terms of fifteen to thirty months' imprisonment for each count of arson-endangering property. Although the record does not include an order granting Attorney Wasak's motion to withdraw, we note that new counsel subsequently entered her appearance. Swift thereafter filed a timely notice of appeal, and both he and the trial court complied with Pa.R.A.P. 1925.

Swift raises the following issues for our review:

1. Did [the trial court] err in determining that [Swift] forfeited his right to counsel under the Sixth Amendment to the United States Constitution and Article One, Section Nine of the Pennsylvania Constitution where [Swift] did not engage in extremely serious misconduct, extremely dilatory conduct, or any other similarly egregious misconduct?

2. Did [the trial court] err in denying [Swift's] motion to dismiss, made pursuant to Pa.R.Crim.P. 600 and the speedy trial provisions of the United States and Pennsylvania Constitutions (a) where the Commonwealth failed to demonstrate that the delay in bringing [Swift] to trial in compliance with the mandates of Pa.R.Crim.P. 600 resulted from circumstances beyond its control and/or despite its exercise of due diligence, and (b) where [the trial court] deprived [Swift] of his right to counsel and then curtailed his ability to make a record on his constitutional claims, and (c) where [the trial court] failed to even consider or analyze [Swift's] claims regarding the violation of his constitutional right to a speedy trial under the United States and Pennsylvania Constitutions?

3. Did [the trial court] err in imposing separate sentences for [Swift's] convictions at counts [three] and [four] (arson-endangering property-reckless endangerment of inhabited

- 15 -

building as to 1500 and 1504 Ridge Avenue, respectively) where the statute providing for the offense, properly construed according to the rules of statutory interpretation, provides for a single sentence no matter how many properties were endangered?

Swift's Brief at 4 (unnecessary capitalization omitted).

In his first issue, Swift argues that the trial court erred in determining that he forfeited his right to counsel in violation of the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution. A challenge to the alleged forfeiture of counsel presents a question of law, for which our standard of review is *de novo*. **See Commonwealth v. Lucarelli**, 971 A.2d 1173, 1178 (Pa. 2009). The Sixth Amendment of the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution guarantee a criminal defendant the right to assistance of counsel. **See id**.

> However, the constitutional right to counsel of one's own choice is not absolute. Rather, the right of an accused individual to choose his or her own counsel, as well as a lawyer's right to choose his or her clients, must be weighed against and may be reasonably restricted by the state's interest in the swift and efficient administration of criminal justice. Thus, while defendants are entitled to choose their own counsel, they should not be permitted to unreasonably clog the machinery of justice or hamper and delay the state's efforts to effectively administer justice.

*Id*. at 1178-79 (citations omitted). Pertinently, the forfeiture of counsel does not require the intentional relinquishment of a right. **See id**. at 1179. Instead, forfeiture is the result of a defendant's "extremely serious misconduct" or "extremely dilatory conduct." **Id**. When determining whether a defendant has engaged in "extremely dilatory conduct," a court must

address "as a threshold issue whether a defendant's misconduct resulted in a delay in the proceedings." *Commonwealth v. Cook*, 325 A.3d 1275, 1279 (Pa. Super. 2024).

In *Commonwealth v. Kelly*, 5 A.3d 370 (Pa. Super. 2010), this Court considered forfeiture of counsel. After the defendant pleaded guilty, he filed a *pro se* motion to withdraw his plea, challenging counsel's effectiveness. *See id*. at 372. At the hearing on this motion, the defendant represented himself with the assistance of standby counsel from the P.D.'s Office. *See id*. The trial court granted the withdrawal of the defendant's guilty plea, but denied his oral motion for appointment of another counsel, and instructed the defendant to proceed to trial with the same standby counsel. *See id*. at 373. On the day of trial, the defendant alleged "an irreconcilable breakdown in communications" with standby counsel, and claimed that counsel refused to argue his "defense or [the] claims that [he] raised." *Id*. The trial court continued the trial and formally appointed another attorney. *See id*. at 374.

One month later, newly-appointed counsel filed a petition to withdraw, alleging that the defendant was uncooperative and had accused him of working for the Commonwealth and lying to him. *See Kelly*, 5 A.3d at 374. At a hearing on this motion to withdraw, the defendant alleged that counsel was ineffective for refusing to argue his view of the law. *See id*. at 374-75. The trial court permitted counsel to withdraw and ordered the defendant to proceed *pro se*. *See id*. at 376. The court found that the defendant forfeited

his right to counsel as he refused to cooperate with any of his appointed attorneys. *See id*.

On appeal, the defendant argued, *inter alia*, that he did not waive or forfeit his right to counsel. This Court disagreed, reasoning that the defendant failed to cooperate with all three lawyers appointed to him and repeatedly accused each of ineffective assistance. *See id*. at 381. This Court found that the defendant "wanted a counsel, but only one who would please him[.]" *Id*. The **Kelly** Court quoted an opinion by the United States Court of Appeals with approval:

> We have recognized a right of a defendant to proceed without counsel and to refuse the representation of assigned counsel. . . . He may not use this right to play a 'cat and mouse' game with the court . . . or by ruse or stratagem fraudulently seek to have the trial judge placed in a position where, in moving along the business of the court, the judge appears to be arbitrarily depriving the defendant of counsel. . . .

*Id*. (*quoting* **United States ex rel. Davis McMann**, 386 F.2d 611, 618-19 (2d Cir. 1967)).

In the instant case, Swift argues that the trial court erred by determining that he forfeited his right to counsel pursuant to the Sixth Amendment and Article I, Section 9. He argues that he "did not engage in physically abusive or threatening conduct, extremely dilatory conduct, or any other extremely egregious misconduct warranting a finding of forfeiture of counsel." Swift's Brief at 20. Instead, Swift argues that the court misinterpreted his numerous attempts to communicate with his attorneys. For example, Swift contends

that he filed a complaint against Attorney Herring ten days before trial because Attorney Herring still had not reviewed the Commonwealth's evidence with him, nor begun preparing a trial strategy with his involvement. As for Attorney Saba, Swift argues that their disagreements arose in the context of his theft charge, an entirely different legal matter. Thus, Swift maintains the trial court erred by misconstruing these disagreements as challenges to Attorney Saba's representation in the underlying matter.

Additionally, Swift argues that his conduct is distinguishable from that in **Kelly**; whereas the defendant in **Kelly** failed to cooperate with each of his appointed lawyers, Swift avers that his lawyers "failed to cooperate with him." Swift's Brief at 38. Further, unlike the defendant in **Kelly**, Swift maintains he "never accused either of his attorneys of being incompetent or ineffective for failing to argue his view of the law; [instead] he rightly accused them of being neglectful, non-communicative, and noncollaborative regarding **his** defense." **Id**. (emphasis in original). Swift concludes that because his complaints related to his attorneys' failures to provide the basic, minimum professional obligations of counsel, he did not engage in the extremely serious misconduct or dilatory conduct necessary for a forfeiture of his right to counsel.

The trial court determined that Swift's actions required a finding that he forfeited his right to counsel. The court opined that Swift's case was analogous to that of **Kelly**, reasoning as follows:

> This court has reviewed the record [for] the [January 9, 2023] ruling that [Swift] forfeited his right to counsel. [Swift] was represented by [Attorney Herring] until September 26, 2022. Due

to a number of instances that demonstrated to [the trial court] that [Swift] would not work with [Attorney Herring, the court] then appointed new counsel, [Attorney Saba]. Due to irreconcilable differences, Attorney Saba sought to withdraw and [the trial court] granted that motion on December 12, 2022.

On January 9, 2023, [the trial court] informed [Swift] that he would not appoint a third attorney to represent him at trial but [appointed] stand-by counsel, [Attorney Wasak. W]ith the consent of [Swift], this court permitted standby counsel to serve as trial counsel[,] and [Swift] was therefore[] represented by counsel at trial. Based on the record, it appears as though [the previous trial court judge] ruled that [Swift] forfeited his right to counsel because [Swift] refused to cooperate with his prior counsel and persisted in having an antagonistic relationship with them.

Trial Court Opinion, 1/24/24, at 7-8 (unnecessary capitalization omitted and paragraph break added).

After review, we determine the record supports a finding that Swift engaged in extremely dilatory conduct, which in turn resulted in a delay in the proceedings, and thus he forfeited his right to counsel. *See Cook*, 325 A.3d at 1279. While Attorney Herring represented Swift, Swift filed multiple *pro se* motions. At the September 15, 2022, hearing, Attorney Herring related that the attorney-client relationship had broken down due to Swift's behavior, as Swift: disregarded counsel's advice; frequently contacted and visited Attorney Herring's office unannounced to make demands; and otherwise acted as if he wished to represent himself. The trial court also heard a voice mail, in which Swift demanded that Attorney Herring's assistant make Swift's file available on a date Swift knew Attorney Herring would not be present, so that Swift may review his file with a ***different*** attorney.

Nonetheless, at the conclusion of this hearing, the trial court granted Swift's request to keep Attorney Herring as appointed counsel, and once more explained that Swift had to cooperate with counsel's scheduling process and cease filing *pro se* motions. Swift acknowledged that he understood the court's instructions and agreed to change his behavior accordingly.

Within six days, however — and a week before trial — Swift again filed a *pro se* motion, this time to remove Attorney Herring as his appointed counsel. In response, Attorney Herring filed a motion to withdraw, explaining that since the previous hearing, Swift sent him an email, detailing a number of complaints regarding his representation. On September 26, 2022, the date scheduled for trial, the trial court instead held a hearing to review both motions. Attorney Herring stated that despite Swift's complaints and a breakdown in their attorney-client relationship, Attorney Herring scheduled a meeting with Swift, but Swift arrived at his office before the appointment time. Although Attorney Herring accommodated Swift by meeting with him upon his arrival, the meeting was brief and hostile, and ultimately resulted in Swift informing counsel that he did not want to work with him any longer. The trial court granted Attorney Herring's motion to withdraw and indicated that trial could not proceed that day.

The record indicates that Swift's experience with Attorney Saba was similar. Following six weeks of Attorney Saba's representation, the trial court held a hearing on December 12, 2022, on Attorney Saba's petition to withdraw. Attorney Saba stated that Swift ignored his legal advice and

demanded that he argue Swift's view of the law. Swift admits to this behavior on appeal, but argues that it pertained to his separate theft case, and is thus not relevant to determine whether he forfeited counsel in this arson case. However, Swift ignores the fact that Attorney Saba motioned to withdraw as counsel in **both** cases due to Swift's non-cooperative behavior.

In sum, the record shows that the trial court advised Swift to change his problematic behavior multiple times, he failed to do so, and his actions caused delays in the proceedings. **See** N.T., 9/15/22, at 28; **see also** N.T., 9/26/22, at 9-10. We emphasize that Swift did not have the right to choose counsel, and that the trial court was required to be mindful to minimize delay. **See Lucarelli**, 971 A.2d at 1178. Here, Swift worked with two court-appointed attorneys over a two-year period, and both attorneys reported an irreconcilable breakdown in the attorney-client relationship due to his uncooperative nature. On this record, we conclude that the trial court's finding that Swift forfeited his right to counsel was both appropriate and supported by the record.

Additionally, Swift acknowledges that Attorney Wasak, who was appointed as standby counsel on January 11, 2023, formally entered his appearance on March 11, 2023, as counsel of record and represented Swift throughout his jury trial. Nonetheless, Swift argues the trial court's order prejudiced him because: (1) Swift was not represented during the hearing on his Rule 600(A) motion; and (2) Attorney Wasak only had fifteen days to prepare for his jury trial. In light of our above determination that Swift

forfeited his right to counsel, however, we conclude that no relief is due. Accordingly, we hold Swift's first issue lacks merit.

In his second issue, Swift challenges the denial of his Rule 600(A) motion. Our standard of review of a decision on a Rule 600(A) speedy trial motion is whether the trial court abused its discretion. **See Commonwealth v. Ramos**, 936 A.2d 1097, 1100 (Pa. Super. 2007) (*en banc*).

> An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused.
>
> The proper scope of review . . . is limited to the evidence on the record of the Rule 600 evidentiary hearing, and the [trial court's] findings. An appellate court must view the facts in the light most favorable to the prevailing party

**Id**. (brackets omitted).

Pennsylvania Rule of Criminal Procedure 600(A) states that "[t]rial in a court case in which a written complaint is filed against the defendant shall commence within 365 days from the date on which the complaint is filed." Pa.R.Crim.P. 600(A)(2)(a). This initial 365-day period ends at "the mechanical run date." **Ramos**, 936 A.2d at 1101. Pursuant to Rule 600(C), "the mechanical run date can be modified or extended by adding . . . any periods of time in which delay is caused by the defendant." **Id**. This new date is the "adjusted run date." **Id**. Under Rule 600(A), the trial court:

> may exclude not just the time that the defendant or his attorney is unavailable for trial, but the entire period of delay that results from such unavailability. [A]ctual delay caused by the defendant's

unavailability includes the period of time from the date of his unavailability until the earliest practicable trial date.

***Commonwealth v. Logsdon***, 803 A.2d 1289, 1291 (Pa. Super. 2002) (citation and emphases omitted).

Pertinently, Rule 600(C) states that "periods of delay at any stage of the proceedings caused by the Commonwealth when the Commonwealth has failed to exercise due diligence shall be included in the computation of the time within which trial must commence. Any other periods of delay shall be excluded from the computation." Pa.R.Crim.P. 600(C)(1).

In ruling on a defendant's Rule 600 motion, the trial court must "determine whether the Commonwealth has met its obligation to act with due diligence in preventing delay throughout the life of the case." ***Commonwealth v. Harth***, 252 A.3d 600, 618 (Pa. 2021). "[T]he onus is on the Commonwealth to demonstrate that it engaged in due diligence in at least being capable of bringing a defendant to trial within the prescribed time parameters". ***Commonwealth v. Wiggins***, 248 A.3d 1285, 1289 (Pa. Super. 2021). "Due diligence is fact-specific, to be determined case-by-case; it does not require perfect vigilance and punctilious care, but merely a showing the Commonwealth has put forth a reasonable effort." ***Commonwealth v. Selenski***, 994 A.2d 1083, 1089 (Pa. 2010) (citation omitted). "[I]f the Commonwealth meets its burden of proving due diligence, only then may the trial court rely upon its own unavailability due to a congested calendar or other scheduling problems as justification for denying the defendant's motion." ***Harth***, 252 A.3d at 618.

Swift argues that the trial court erred in denying his Rule 600(A) motion, as he calculated more than 365 unexcused days passed between the July 2019 filing of the criminal complaint and his March 2023 trial. Swift first avers the mechanical run date was July 19, 2020, but acknowledges various excusable delays, resulting in an adjusted run date of March 10, 2022.[5] As stated above, trial commenced on March 27, 2023.

Swift claims the trial court abused its discretion by ruling that the following periods of delay were excused or excluded from its Rule 600(A) calculation: (1) 168 days, between October 13, 2021, and March 30, 2022; and (2) 125 days, between May 24, 2022, and September 26, 2022.[6] For ease of disposition, we will address these periods separately. We note that Swift additionally avers that the trial court erroneously prevented him from making a record concerning his right to a speedy trial at his Rule 600 hearing; we will address this argument last.

We first address Swift's argument that the trial court erroneously excluded the 168 days between October 13, 2021, and March 30, 2022, from

---

[5] Swift acknowledges the following excusable delays: (1) thirty-five days, between July 30, 2019, and September 17, 2019, attributable to his request to postpone his preliminary hearing; and (2) 563 days, between March 16, 2020, and October 1, 2021, due to the COVID-19 statewide judicial emergency. *See* Swift's Brief at 43-44.

[6] Swift also argues the "Rule 600 violation continued" from March 30, 2022 — when the Commonwealth requested a continuance — through May 24, 2022. Swift's Brief at 49. Swift argues the Commonwealth did not disclose a reason for this continuance, and thus did not demonstrate that it exercised due diligence. Nevertheless, Swift acknowledges the trial court *included* this time, in his favor, in its Rule 600(A) calculations. *See id*.

its Rule 600(A) calculation. We reiterate that trial was initially scheduled for October 13, 2021, but Attorney Herring had filed a motion for continuance, the attorneys appeared in court, and Swift did not appear, possibly due to miscommunication from Attorney Herring. *See* N.T., 10/13/21, at 2. The trial court issued an arrest warrant for Swift, but lifted it on October 26, 2021, and rescheduled trial for March 30, 2022. *See* Order, 2/17/23, at 4.

Swift contends that the trial court should not have attributed to him the thirteen-day delay, between October 13, 2021, and October 26, 2021, because Attorney Herring's staff did not notify him that he was required to appear. Alternatively, even if the trial court did properly exclude this time, Swift claims that because he was available for trial on October 26, 2021, the trial court could only have excluded this thirteen-day period from its calculations, and not the remaining 155 days leading to the March 30, 2022 trial date. Lastly, Swift asserts the record does not show that March 30, 2022, was indeed the "earliest practicable trial date." Swift's Brief at 48. Swift maintains the trial court abused its discretion by excluding this 168-day period from its Rule 600(A) calculation.

In denying Swift's Rule 600(A) motion, the trial court found:

16. On October 13, 2021, [Swift] failed to appear for trial and a warrant was issued for his arrest. The warrant was subsequently cleared on October 26, 2021 and the case was relisted for trial for March 30, 2022.

17. Pursuant to Pennsylvania precedent, the time period between October 13, 2021 and March 30, 2022, a total of 168 days[,] is attributable to [Swift] and therefore excludable from Rule 600

- 26 -

calculations. *See* [*Logsdon*, 803 A.2d at 1291] ("Under Rule [600], the [trial court] may exclude not just the time that the defendant or his attorney is unavailable for trial, but the entire period of delay that results from such unavailability. The Superior Court has further held that actual delay caused by the defendant's availability includes the period of time from the date of his unavailability until the earliest practicable trial date. Any delay caused by the unavailability of a defendant is excluded from computation of the Rule 600 period." . . .).

Order, 2/17/23, at 4-5.

After review, we discern no abuse of discretion with the trial court's exclusion of this period from its Rule 600(A) calculation. Initially, we disagree with Swift's argument that the entire 168-day delay, caused by his failure to appear on October 13, 2021, should have been excluded. As Swift acknowledges, his failure to appear was a result of Attorney Herring's miscommunication, not the Commonwealth's actions. Moreover, we highlight that Swift filed a motion for a continuance of trial from that date. Thus, the trial court properly found the delay from October 13, 2021, through the next scheduled trial date of March 30, 2022, was excludable. *See Ramos*, 936 A.2d at 1101; *see also Logsdon*, 803 A.2d at 1291. Furthermore, Swift has waived any argument that March 30, 2022, was not the earliest practicable trial date, as he made no such claim before the trial court, and instead, raises it for the first time on appeal. *See* Pa.R.A.P. 302(a) (providing that "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal").

We now address the contested 125-day period between May 24, 2022, and September 26, 2022. We reiterate that on May 24, 2022, the day

scheduled for trial, the Commonwealth stated it received late notice that Culligan and her daughter would be unavailable beginning the next day, May 25, and the trial court continued trial to September 26, 2022. Swift argues the Commonwealth failed to prove it exercised due diligence, where it "offered no competent evidence of the circumstances attending this scheduling problem, such as when the necessary witnesses were provided notice of the court date, when they made their travel plans, or even when the Commonwealth had last communicated with them." Swift's Brief at 51 (emphasis and footnote omitted). Accordingly, Swift argues the trial court should have included this 125-day period in its Rule 600(A) calculation.

The trial court excluded these dates from its Rule 600(A) analysis, reasoning as follows:

19. On May 24, 2022, [the rescheduled trial date,] the Commonwealth again sought a . . . continuance due to witness unavailability. [Swift] objected to the request. In an effort to proceed with trial, the Commonwealth [contacted the trial court two weeks prior to the trial date and] proposed two alternative[s: (1)] conduct jury selection in advance of the May 24th trial date so that the Commonwealth witnesses could testify on May 24, 2022 prior to leaving for their trip the following day; or (2)] move the trial date one week, and commence jury selection and the trial on June 1, 2022. Neither of the Commonwealth's suggestions could be accommodated due to conflicts either with the court and/or defense counsel's schedules.

20. At the February 8, 2023 hearing on the [Rule 600] Motion to Dismiss, the Commonwealth argued the measures it took in advance of seeking a continuance on May 24, 2022 demonstrated an exercise in due diligence. Accordingly, it maintained that the time period from June 1, 2022 through the next trial listing on September 26, 2022 should be excluded. . . .

21. "It is well-settled that 'the Commonwealth cannot be held to be acting without due diligence when a witness becomes unavailable due to circumstances beyond its control.'" *Commonwealth v. Wendel*, 165 A.3d 952, 957 (Pa. Super. 2017) . . ..

\* \* \* \*

23. The court finds that the Commonwealth acted in both good faith and with due diligence when it apprised the court two weeks in advance of . . . May 24, 2022 when it learned of their unavailability. The reason for their unavailability was beyond their control and the Commonwealth's alternative trial proposals demonstrated due diligence. *Commonwealth v. Brawner*, 553 A.2d 458, 461 (Pa. Super. 1989) (A witness's unavailability by reason of vacation, illness, or other reason, not within the Commonwealth's control that prevents the Commonwealth from commencing trial despite its due diligence is not attributable for purposes of speedy trial calculations.)

24. Consequently, the 125 days that accrued between May 24, 2022 and September 26, 2022 are excludable.

Order, 2/17/23, at 5-6 (unnecessary capitalization and footnotes omitted).

We discern no abuse of discretion with the trial court's exclusion of this 125-day period from its Rule 600(A) calculation. The record shows, and Swift does not dispute, that the Commonwealth requested a continuance due to witness unavailability, which it learned of within a month of trial. At the Rule 600 hearing, the Commonwealth reiterated that it contacted the trial court soon after learning about Culligan and her daughter's unavailability, and that it attempted to prevent delay by suggesting the court expedite jury selection. On this record, we do not find the trial court abused its discretion in determining the Commonwealth acted with due diligence. *See Selenski*, 994 A.2d at 1089. Thus, we hold the trial court properly excluded the 125-day

period between May 24, 2022, and September 26, 2022, from its Rule 600(A) calculations.

Finally, Swift contends, for the first time on appeal, that the trial court erroneously prevented him from making a record, at the Rule 600 hearing, concerning his Constitutional right to a speedy trial under the United States and Pennsylvania Constitutions. Specifically, Swift argues the trial court improperly "cut [him] short" when he "sought to proffer information regarding the prejudice he suffered *vis-à-vis* unavailable witnesses[.]" Swift's Brief at 56.

However, we note that Swift does not cite to the place in the record where he raised this issue before the trial court. **See** Pa.R.A.P. 2117(c)(1), (3) (providing where "an issue is not reviewable on appeal unless raised or preserved below," the statement of the case shall specify the place in the record where "the questions sought to be reviewed were raised" and "[t]he way in which they were passed upon by the court"). Thus, we determine this issue is waived. **See** Pa.R.A.P. 302(a). For the foregoing reasons, we conclude no relief is due on Swift's second issue.

In his final issue, Swift maintains the trial court erred by imposing separate sentences for his two convictions of arson-endangering **property**. Swift's claim implicates the legality of his sentence. Thus, our scope of review is plenary, and our standard of review, *de novo*. **See Commonwealth v. Smith**, 298 A.3d 1140, 1143 (Pa. Super. 2023) (*en banc*). In **Smith**, this Court concluded: (1) the unit of prosecution for the offense of arson-

endangering **persons**, under subsection 3301(a)(1)(i), "is the intentional starting of a fire which recklessly places another **person** in danger of death or bodily injury[;]" and thus (2) "a defendant may be convicted of and sentenced separately on multiple counts if one act of arson causes more than one **person** to be in danger of death or bodily injury." **Id** at 1148 (emphasis added). President Judge Lazarus authored a dissent, opining that the statutory language of subsection 3301**(a)(1)(i)** was ambiguous, and thus "under the rule of lenity, we are required to strictly construe the statute in favor of the" defendant. **Id**. (Lazarus, P.J., dissenting).

Swift relies on the dissenting opinion of **Smith** and avers the unit of prosecution under **subsection 3301(c)(2)** is the intentional starting of a fire, and not the endangerment of another property. Swift asserts that because the jury found he intentionally started only one fire, the trial court should have only imposed a sentence for one of the counts, regardless of the number of buildings endangered by that fire. Although Swift concedes that the majority holding is currently binding on this panel, he emphasizes that a petition for allowance of appeal from **Smith** is pending before the Pennsylvania Supreme Court.[7] Thus, Swift maintains that he raises this issue to preserve it for review should the Supreme Court overrule our previous holding.

_____

[7] We note that since Swift filed his brief, our Supreme Court granted allowance of appeal in **Smith**, on June 5, 2024, to consider whether "the *en banc* panel erroneously [held] that the unit of prosecution for the offense of arson endangering persons . . . is not each arson, but, rather, each endangered person . . .." **Commonwealth v. Smith**, 320 A.3d 82 (Pa. 2024).

We conclude no relief is due. Swift ignores that **Smith** addressed a different subsection of the arson statute — subsection 3301(a)(1)(i), arson-endangering persons. **Smith** made no mention of, let alone any holding pertaining to, subsection 3301(c)(2), arson-endangering property. Swift presents no argument why this Court should extend the dissenting opinion in **Smith**, again pertaining to subsection 3301(a)(1)(i), to subsection 3301(c)(2). Accordingly, Swift's reliance on **Smith** is misplaced.

In any event, even if **Smith** were relevant to this appeal, Swift acknowledges that the majority decision is binding on this panel regardless of its status before the Pennsylvania Supreme Court. **See Commonwealth v. Pepe**, 897 A.2d 463, 465 (Pa. Super. 2006) (reasoning that even though the Pennsylvania Supreme Court has granted review on an issue, until the Court rules upon the question, this Court's prior decision is binding).

As each of Swift's issues are without merit, we affirm his judgment of sentence.

Judgment of sentence affirmed.

President Judge Emeritus Stevens joins the memorandum.

Judge Dubow files a concurring statement, in which President Judge Emeritus Stevens joins.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


DATE: 04/10/2025